No. 2192

Second Circuit

FORD v. CALHOUN

(April 8, 1927. Opinion and Decree.)

(*Syllabus by the Court*)

1. **Louisiana Digest—Bastards and Natural Children—Par. 9.**

The method prescribed by Act 203 of the Civil Code for acknowledging illegitimate children by their parents is not exclusive.

2. **Louisiana Digest—Bastards and Natural Children—Par. 7, 9.**

The jurisprudence authorizing methods of acknowledging illegitimate children otherwise than by notarial passed before two witnesses, as laid down in Civil Code, Art. 203, is stare decisis.

3. **Louisiana Digest—Bastards and Natural Children—Par. 7, 8.**

The method of acknowledging illegitimate children otherwise than as laid down in Civil Code, Art. 203, applies to father as well as mother.

4. **Louisiana Digest—Bastards and Natural Children—Par. 7.**

Where a father habitually and consistently claimed a child as his son from the day of his birth to the day of the father's death, over a period of forty years, kept him in his house and reared him as his son, the child is "duly acknowledged", and becomes a natural child and is called to the inheritance of the natural father when he has left no descendants, ascendants, collateral relations or surviving wife.

5. **Louisiana Digest — Prescription — Par. 20, 35.**

To support the plea of prescription of ten years the proof must show possession under deed translative of property for ten years.

Appeal from the First Judicial District Court of Louisiana, Parish of Caddo. Hon. E. P. Mills, Judge.

Action by Norman Ford against Pauline Calhoun, et al.

There was judgment for plaintiff and defendants appealed.

Judgment affirmed.

Melvin F. Johnson, Crain, Jackson & Johnson, of Shreveport, attorneys for plaintiff, appellee.

A. J. Murff, W. A. Mabry, of Shreveport, attorneys for defendants, appellants.

ODOM, J. This is a petitory action. Plaintiff claims to be the owner of cer-

tain real estate situated in Caddo parish, Louisiana. The property was acquired of plaintiff's father, Simon Ford, and plaintiff claims by inheritance from him. The suit is against several parties who are in possession of and claim to own the land.

The district judge rendered a written opinion, found in the record, in which he has correctly stated the facts.

His holdings on the law points involved are, in our opinion, correct also.

His opinion, in full, is as follows:

"Simon Ford was an old slave-time negro. Before the war he took up with a woman named Lucy and had by her two children, Jim and Ary Ford. Simon's owner moved away, separating the pair who never went back together; Lucy afterward having several other men and other children.

"During the war and just before emancipation, Simon took up with Charity, a slave woman, and had by her a son named Norman, the present plaintiff. He was born just before the surrender. Charity died a few weeks after his birth. Simon then lived with Jane Kennon, presumably a sister of Charity, who already had a son, Miles, by a man named McMullen. There was born to Jane and Simon four children: Emma, Penny, Florence and Mitchell. The three girls died before Simon, leaving no heirs. Jane died about 1873.

"At this (time) Rachel Magee, a woman from Mississippi, came to live with Simon. She is claimed to have been married to a man named Boss Magee in Mississippi. At any rate, she had a child by him named Pauline, one of the defendants in this suit. Shortly after going to Simon, Rachel went back to her home and returned with Pauline. There is no evidence that Rachel was ever married to Magee, except that testimony of Pauline. She claims to have possessed their marriage license, but failed to produce it in court. A marriage certificate shows that Boss Magee married one Mary Cotton in 1873, which negatives the idea that he was then married to Rachel. Simon appears to have had other children 'on the side'.

"From the mass of dubious testimony, we are satisfied that Simon was not married to Lucy, merely living with her as a slave union. The same is true of Charity. There is no satisfactory evidence that he ever married Jane, though he appears to have acknowledged her as his wife.

"There is filed in evidence a copy of a marriage license issued to Rachel Magee and Simon Ford. While it is not returned, showing that the marriage was performed, one of the witnesses testified that his father attended the wedding of Rachel and Simon. Simon lived with Rachel until the time of her death on the property in question in 1901. He openly acknowledged her as his wife. In October, 1893, he refers to her in an act of donation passed before Mr. Fred Leonard, who knew the old negroes of the parish very well, as his wife, and makes the donation in consideration of the love and affection he bears her. After her death in her succession he makes affidavit that she was his wife. Jim Ford, a reputed son of Lucy, says that he understood that his father married Rachel. Simon had no children by Rachel.

"Taking into consideration his long cohabitation with Rachel, the issuance of the marriage license, his acknowledging her as his wife both verbally and in the solemn instruments referred to above, we conclude that Simon married Rachel in 1873.

"We think that if Rachel married Boss Magee, that he had obtained a divorce from her, else he would not have married Mary Cotton in the same vicinity in 1873, so soon after his separation from Rachel.

"Simon Ford acquired the property involved in this litigation, known as Lots 3 and 5 of Section 5, Township 17, Range 13, Caddo parish, containing 23.40 acres,

from W. J. Sayers in October, 1893, paying $150.00 cash therefor. To be exact, on the 18th day of October. On the next day he executed an act of donation of the whole property to Rachel, designating her as his wife. There is only one witness to the act.

"Rachel Ford died in 1901. Pauline Calhoun was put into possession of the property in the succession of Rachel Ford, No. 7232 on the docket of this court. In the proceeding, Simon Ford makes affidavit that Rachel Ford was his wife.

"Thereafter, November 4, 1901, Pauline Calhoun donated, by authentic act, a one-half interest in the property to Simon.

"Simon Ford must have died very soon after the above act, as his succession was opened December 16, 1901, being No. 729? on the docket of this court. The original papers are lost, but a certified copy of the judicial record shows that F. A. Leonard was appointed administrator, the one-half interest in the property being valued at less than $500.00. There is no mention of any heirs.

"Concluding, then, that Simon and Rachel were married in 1873, the date of the issuance of the license, and that Rachel, if ever married to Magee, had divorced him, else the two parties would not have so soon remarried, the property in controversy, purchased in 1893, was community property, and that upon the death of Rachel her half was inherited by Pauline.

"There is no question that the donation from Simon to Rachel was a nullity for the reason that it conveyed all the property that he owned and left him destitute.

"The next question then is, to whom did the rest of the property, Simon's half interest, go.

"It is clearly proven that Simon left no wife, legitimate descendants, ascendants or collaterals. Norman and Mitchell have always been publicly acknowledged by Simon as his children. They have never been acknowledged by notarial act, as re-

quired by Article 203 of the Civil Code. Does the habitual public acknowledgment permit them to inherit? This question seems finally settled in the affirmative in the case of Taylor vs. Allen, 151 La. 82, 91 South. 635.

"Therefore plaintiff would inherit half of his father's interest in the property, or one-fourth of the whole property, unless he has lost that right by prescription or otherwise.

"His right to have the donation from Simon to Rachel set aside is not prescribed. Ackerman vs. Larner, 116 La. 101, 40 South. 581. This donation being annulled, that from Pauline to Simon falls for the same reason.

"Pauline Calhoun's plea of ten years' prescription is not good for the reasons that she was not in good faith and for the further reason that an act of partition cannot be the basis of a plea of prescription. Kernan vs. Baham, 45 Ann. 799, 13 South. 155.

"The same case applies to the plea of prescription of ten years filed by Luke and Cora Allen, as their first title translative of property is dated October 28, 1912, while this suit is filed October 10, 1922.

"As to the plea of prescription of J. S. Williams, no deeds are offered or evidence submitted to substantiate his plea.

"There is accordingly judgment for plaintiff as prayed for against defendants, Pauline Calhoun, Luke and Cora Allen, and J. S. Williams, as to a one-fourth interest in the property described in plaintiff's petition. The suit is not at issue as to the other defendants."

Supplementing the court's statement as to acknowledgment of Simon Ford, the father, of his son, Norman Ford, the plaintiff, it will be observed that the father did not by notarial act, passed in the presence of two witnesses, formally acknowledge his son; but a reading of the testimony discloses that he did habitually and consistently acknowledge and claim plaintiff as his son from early child-

hood down to the date of the father's death in 1901, or over a period of forty years.

The record in this case is voluminous, a great many witnesses having been called to testify as to the various points raised in the case.

On the point as to whether the father, Simon Ford, acknowledged his son, Norman, the plaintiff in this case, there were eleven witnesses who testified directly on that point. Among them were colored people ranging in ages all the way from fifty-three to seventy-seven years, each of whom having known plaintiff and his father from the early childhood of the plaintiff down to the time that the suit was tried.

Among these are Jim Ford, seventy-five years old; Ara McCoy, seventy-seven years old, both illegitimate children of Simon Ford, but were not acknowledged by him, and who claim no interest in his succession; and Mitchell Ford, another son, who was acknowledged by him and who owns an undivided one-fourth interest in his succession. Also Pauline Calhoun, a stepdaughter of Simon Ford and one of the defendants in this case, and her husband, Charlie Calhoun.

These witnesses, together with others, testify that Simon Ford, the father, had repeatedly told them that Norman was his son; that he always referred to him as his son, and at times called him his favorite son.

A number of these witnesses testify that Simon had kept Norman in the house with him while a child and had reared him as his son. It is in evidence that the child's mother died when he was an infant and that his father carried him to a woman named Mariah to be cared for. That later, when the father took up with another woman, he demanded custody of his child and probably had a lawsuit with Mariah in order to obtain his custody, but finally got him, took him home and kept him.

Some of the witnesses swore that about 1874 (the boy was born in 1864) he acted as carriage boy for some white people and lived with the "white folks", but that during that time he visited his father constantly.

One of the witnesses testified that the father always claimed the child as his own but said he was hard to keep at home; that he would run away, and that the father had to go and get him and bring him back. This was when the boy had grown almost to manhood.

Each and every one of the witnesses who claimed to know the family said that it was generally recognized and understood in the community where they had lived that Norman was the son of Simon.

But counsel for defendants urge the point that a parent can acknowledge an illegitimate child in no other way than that prescribed in Article 203 of the Civil Code.

That point was settled in the case of Taylor vs. Allen, 151 La. 82, 91 South. 635; and in a later decision, Murdock vs. Potter, 155 La. 145, 99 South. 18, the court said that the jurisprudence to the effect that the method of acknowledgment set out in the Code is not exclusive is stare decisis.

Counsel urge the point, however, that the rule established in the jurisprudence

24 La. App.

applies to an acknowledgment by the mother and not by the father, and they state, in brief, that in all the cases where the court held that an illegitimate child might prove acknowledgment by the parent otherwise than by notarial act in the presence of two witnesses, as is prescribed in the Code, it was the mother who had made the acknowledgment and not the father.

We are not impressed by the argument that the law makes any distinction.

Article 203 of the Code reads:

"The acknowledgment of an illegitimate child shall be made by a declaration executed before a notary public, in the presence of two witnesses, by the father and mother or either of them, whenever it shall not have been made in the registering of the birth or baptism of such child."

The Code makes no distinction between an acknowledgment by the mother and that of the father. The child may be acknowledged by notarial act by either.

The question which so long agitated the courts and which has been settled, was whether an illegitimate child might prove acknowledgment in a mode other than as prescribed by Article 203 of the Code.

The Code specifically says that either the mother or father may acknowledge the child, and it points out a method of acknowledgment. The point which has been definitely settled is that the method of acknowledgment prescribed in the Code is not exclusive.

Therefore, if the mother may acknowledge her illegitimate child otherwise than by notarial act passed in the presence of two witnesses, why cannot the father do the same thing? Counsel point out no reason why there should be a distinction, and if the courts have made any we are not aware of it.

While it is true that in the majority of the cases where the question arose the child claimed acknowledgment by the mother, yet the point was not whether a mother may acknowledge an illegitimate child otherwise than by notarial act, but whether the method of acknowledgment prescribed by the Code is exclusive; and the courts have held that it was not.

In the case of Succession of Hebert, 33 Ann. 1103, the court said:

"This court has decided that the requirements of written recognition did not apply to white or colored children descending from white or colored parents."

In the case of Fortier, 51 La. Ann. 1584, 26 South. 554, the court held that the acknowledgment of illegitimate children by a declaration before a notary is not the only method of acknowledgment recognized by the Code. Citing Lange vs. Richoux, 6 La. 560.

In Bourriaque vs. Charles, 107 La. 217, 31 South. 757, the court said:

"The proof of acknowledgment has not been confined to Article 203, Civil Code, and does not exclude the provision of Articles 207, 208, Civil Code."

Citing Lange vs. Richoux, supra.

In Briggs vs. McLaughlin, 134 La. 133, 63 South. 851, the court said (page 142):

"In Succession of Vance, 110 La. 760, 34 South. 767, though the court held that the proof was insufficient to establish the acknowledgment of a natural daughter, by a father, it distinctly declared its adher-

ence 'to the jurisprudence authorizing methods of acknowledgment of illegitimate children otherwise than as laid down in Civil Code, Article 203'."

In Succession of Vance, 110 La. 760, 34 South. 767, an illegitimate child claimed rights under the succession of his father who, it was claimed, had acknowledged it. The child was excluded from the succession, not because a father could not acknowledge his child otherwise than by notarial act, but on other grounds. In that case the court, after discussing the difference between proof of paternal descent and paternal acknowledgment, said:

"These are directions, it will be seen, for proving paternal descent, which is not the same thing as acknowledgment by the father, and it is acknowledgment by the father which converts the illegitimate child, or bastard, into the 'natural' child, and from which spring the rights with which the natural child is invested by law. But though we adhere to the jurisprudence authorizing the methods of acknowledgment of illegitimate children otherwise than as laid down in Civil Code, Article 203, it is impossible to hold that what Vance said to the witness, Lee, as hereinbefore set forth, suffices to invest her with the title of a legally acknowledged, or natural child."

And the court said, further:

"If calling a child his offspring be relied on to establish legal acknowledgment, the proof should be that the father was in the habit of so calling the child when speaking of it, or did so in habitual conversation with others."

The present Code provides that the acknowledgment of the illegitimate child shall be made by notarial act by the mother and father or either of them.

We conclude, therefore, that if that method is not exclusive then either the mother or father may acknowledge an illegitimate child otherwise than as therein pointed out.

As to the effect of acknowledgment, insofar as the right of inheritance is concerned, the Code makes a distinction, and there, we think, is where counsel have become confused.

"Natural children are called to the legal succession of their natural mother, when they have been duly acknowledged by her, if she has left no lawful children or descendants, to the exclusion of her father and mother and other ascendants or collaterals of lawful kindred."

Civil Code, Article 918.

Whereas:

"Natural children are called to the inheritance of their natural father, who has duly acknowledged them, when he has left no descendants nor ascendants, nor collateral relations, nor surviving wife, and to the exclusion only of the state."

Civil Code, Article 919.

Natural children inherit from their parents, either the father or mother. The difference between them being that natural children inherit from their natural mother, who has acknowledged them, to the exclusion of all, except legal children and descendants; whereas they inherit from their natural father, who has duly acknowledged them, to the exclusion of the state only.

Illegitimate children "duly acknowledged" by their father do inherit from him, and the fact that they are not entitled to the same rank as heirs in his succession as are children who are "duly acknowledged" by their mother in her succession, is not the point at issue. The question

raised. is, whether a father may acknowledge his illegitimate child in any way other than that pointed out. by the Code; and we hold that he may.

No comment is necessary on the other points raised by appellant, as they have been correctly disposed of by the lower court.

The judgment is affirmed.