93 So.2d 307 (1957)
Laura Evelyn Brown GOINS
v.
Stanley W. GATES et al.
No. 4312.
Court of Appeal of Louisiana, First Circuit.
January 22, 1957.
Rehearing Denied March 25, 1957.
*308 C. W. Berry, Jr., Oakdale, for appellant.
Fusilier & Vidrine, Ville Platte, for appellee.
LOTTINGER, Judge.
Defendant has appealed from an adverse judgment wherein the plaintiff was recognized as the lawful owner of an undivided one-fourth (¼) interest in and to the Southeast Quarter (SE¼) of Section Twelve (12), Township Four (4) South of Range Two (2) West, Louisiana Meridian, containing 161.04 acres, more or less, in Evangeline Parish, Louisiana. The Lower Court has furnished us with a well reasoned and written opinion and we quote same as follows:
"This is a suit by Laura Evelyn Brown Goins, alleging that she is the true and lawful owner of an undivided one-fourth (¼th) interest in and to the tract of land containing 161.04 acres, more or less, situated in Evangeline Parish, Louisiana. She claims that she acquired this property through inheritance from her mother, Lonnie Blueeyes. She further alleges that the property is now being claimed by Stanley Gates, and that she has filed this petitory action to remove this cloud on her title to this property.
"Defendant, Stanley W. Gates, denies the claim; denies that the plaintiff is entitled to recover this land for the simple reason that Lonnie Blueeyes, her alleged mother, was never married to anyone, and if so, that she was married to Arthur Brown, who was a negro or of the colored race, and Lonnie Blueeyes was an Indian, and that further, denied that Lonnie Blueeyes had any children whatsoever. For that reason, defendant prays that this suit be dismissed.
"In addition to the above main demand, there is a secondary demand for damages for timber which is allegedly unlawfully taken from the land of the defendant.
"The Court finds that through the succession proceedings which were filed in evidence, Lonnie Blueeyes, the alleged mother *309 of the plaintiff herein, inherited a one-fourth (¼th) interest of the land in question."
After a careful review of the evidence in this case, the Court concludes:
"That through the succession proceedings which were filed in evidence, Lonnie Blueeyes inherited a one-fourth (¼th) interest of the land in question;
"That Lonnie Blueeyes gave birth to two (2) children, one dying in infancy, the other being the plaintiff here, and her sole heir;
"That the plaintiff was born to Lonnie Blueeyes and that Lonnie Blueeyes duly acknowledged her, making her a natural child under the law, and thus making her eligible to recover her estate.
"The facts are that the plaintiff was born in Elizabeth, Louisiana, in the home of one, Mattie Davis; that she was raised in LeCompte, Louisiana by one, Millie Jackson, a person of the colored race who has Indian blood in her; that she went to school in LeCompte, Louisiana; that she married one, Charlie Goins. There were filed in evidence several photostatic copies of applications for Social Security Benefits, Social Security Cards and the like, evidently for the purpose of showing the Court that this information was given to various people at a non-suspicious time.
"It is to be noted that on the application for Social Security Card filed on September 29, 1943, which was over ten (10) years before this suit was filed, the plaintiff named her mother as `Lonnie Blueeyes,' and that her father's name was listed as `Arthur Brown.'
"The plaintiff testified in the suit that she had secured the information from her elders as to who her father was; she further testified that she was taken to Millie Jackson's home in LeCompte at the age of eighteen (18) months. This testimony is `heresay,' for the very obvious reason that she was too young at that time to remember. The testimony of Millie Jackson confirmed the fact that she raised the plaintiff from the age of eighteen (18) months until she was grown. Millie Jackson says that Lonnie Blueeyes brought her child, Laura Evelyn Brown Goins, a baby of eighteen (18) months to her, and asked her to take this baby and raise her as her own.
"It is in evidence that the mother was then very sick and as disclosed by the evidence further on in the trial, she apparently never recovered from this illness and finally died at the old home in Evangeline Parish.
"In connection with the testimony of Millie Jackson, the plaintiff filed in evidence notarials or affidavits by Mattie Davis to the effect that Laura, the plaintiff, was born in her home. Objection by the defendant to this evidence was made.
"The testimony of the other witnesses satisfied the Court that the plaintiff was the only surviving daughter of Lonnie Blueeyes.
"The Court permitted the introduction of `hearsay evidence' in this case over the objection of the defendant. In the Succession of Anderson, 176 La. 66, 145 So. 270, the case involved the legitimacy of a child. To sustain the contention that hearsay evidence was admissible in a case of this sort, Justice Overton had this to say:
"`Pedigree is the history of family descent, which is transmitted from one generation to another by both oral and written declarations and by tradition. Unless proved by hearsay evidence, not competent in general issues, it cannot in most instances be proved at all. * * *
"`That pedigree may be proved by hearsay testimony is settled. Such testimony is admitted because of the great difficulty, often impossibility, of proving the fact or degree of kinship between alleged relatives, because the subject of inquiry is so frequently of ancient date. Respecting what *310 facts come within the meaning of the word pedigree, and by whom the declaration reproduced as hearsay must have been made, there was some divergence of opinion in the earlier cases. But it seems to be settled now that a declaration, to be admissible, must not only have been by a person since deceased, but must also have been made by a person related by blood or affinity with some branch of the family the pedigree of which is in question.' See also Wigmore on Evidence (2d Ed.) Vol. 3, 1482; Greenleaf on Evidence (10th Ed.) Vol. 1, 14; Abbott's Trial Evidence (4th Ed.) Vol. 1, 174.
"`The circumstantial guaranty for trustworthiness, relative to declarations concerning pedigree, as said by Prof. Wigmore, is found "in the probability that the `natural effusions' (to use Lord Eldon's often-quoted phrase) of those who talk over family affairs when no special reason for bias or passion exists are fairly trustworthy, and should be given weight by judges and juries, as they are in the ordinary affairs of life."'
"The Court again in the [In re] Succession of Gray, 201 La. 121, 9 So.2d 481, the Court stated:
"`In proceeding to have plaintiffs recognized as irregular heirs of the parties' ancestor, and placed in possession of his estate to the exclusion of his natural child and descendants thereof, witnesses' recollection of what the "Old folks" of the community had told him regarding date of his birth and ancestor's marital relations was not inadmissible as "hearsay."'
"It is therefore the considered opinion of this Court that in view of the above authorities, that the objection raised by defendant to the inadmissibility of this evidence should be overruled, the same being an exception to the hearsay rule.
"On the question of acknowledgment, the Louisiana Civil Code provides for acknowledgment of illegitimate children. The Courts have long since declared that the Article stated in the Code, namely Article 203, appears not the exclusive mode for acknowledging a child born out of wedlock and that a mother may acknowledge informally her child in various ways. See Ford v. Calhoun, 6 La.App. 350, Succession of Hebert, 33 La.Ann. 1099, and many other cases, one method being that she calls the child hers and that it is common knowledge among the community that it is her child and there is no concealment of the child. In the case at bar, it is to be observed that the mother brought the child to the old aunt and said that it was her child and that it was common knowledge in the community where she was living at the time that she had had a daughter; even according to the testimony, on her deathbed she acknowledged the fact that Laura, the plaintiff in this case, was her baby.
"Consequently, the Court has no difficulty at arriving at the definite conclusion that Laura Evelyn Brown Goins is the natural child of Lonnie Blueeyes.
"The defendant seems to lay great stress on the idea that a marriage between Negroes and Indians is prohibited. The Court does not believe that it is even necessary to go into that problem in view of the above findings; however, it may be prudent for the Court to take cognizance of this defense. There is no conclusive proof in the record that the mother is pure Indian or that the father is a Negro. However, assuming that to be a fact, the Court will discuss the law applicable thereto.
"Under [LSA] Revised Statutes of 1950, Title 9, Section 391, entitled `Legitimation of Natural Children,' and I quote:
"`Natural fathers and mothers shall have power to legitimate their natural children, by acts declaratory of their intentions, made before a Notary Public and two witnesses; provided there existed at the time of the conception of such children, no other legal *311 impediments to the inter-marriage of the natural father and mother except those resulting from color or the institution of slavery.'
"For purposes of this case, it is not necessary to determine whether the child was legitimated as such, as the only thing that is pertinent is whether or not she was acknowledged and whether or not she was capable of being acknowledged.
"From the above quoted provision, there is no doubt in my mind that the law gives the mother the right to acknowledge a child making it her natural child under the laws of Louisiana. Consequently, the natural child can acquire from her mother as if legitimate. See Article 918 of the [LSA] Civil Code.
"There is a very informative and authoritative Law Review Article in 7 Loyola Law Review, page 94, dealing with irregular successions. The author of that Article goes in all facts of irregular successions and particularly important and pertinent to this case is the part dealing with the acknowledgment of illegitimate children. Thus we see on Page 105 of that Article and I quote:
"`In order that an illegitimate child may be acknowledged or legitimated, there must have been no impediment to the marriage of his or her parents at the time of conception. Thus children born of incestuous or adulterous connections and void unions, such as bigamists or miscegenous were originally barred from being acknowledged, or legitimated. Due to the increasingly charitable disposition of the Courts and the Legislatures to remove the stigma and the disabilities of illegitimacy from children in order that they not be made to suffer for the sins of their parents, this strick prerequisite has been gradually relaxed. Thus the issue of an adulterous connection can now be legitimated by the subsequent void marriage in acknowledgment of their parents. Children of a void union contracted in good faith by one or both parties are legitimated. Children born of parents who were barred from contracting valid marriage due to one parent being of the white race and the other of the Negro race, in view of the fact that they may be legitimated by notarial act, and the greater includes the lesser so that the legitimation includes acknowledgment, such children may also be acknowledged by notarial act.'
"While Article 94 prohibits the marriage between Negro and White races and Title 9, Section 201 prohibits the marriage between Indian race a person of a Colored or Black race, that does not necessarily mean that the acknowledgment Article above referred to in [LSA] R.S. 9:391 has any way been repealed and not in effect any longer.
"It is therefore the opinion of this Court that from the above mentioned Articles and Statutes, together with the authorities cited in 7 Loyola Law Review 94, that assuming that the mother was a pure Indian and her father was a pure Negro, which I have found is in no way proved, even then the mother could informally acknowledge the plaintiff herein, which she did, and therefore, she is entitled to recover her estate upon her death.
"The Court now comes to the secondary issuethe alleged damage for timber. There is some evidence by some of the witnesses that some timber was cut on this land by someone, and while it leads to the defendant, the Court is unable to determine for a certainty that the defendant had the timber cut.
"In addition to that, there is no evidence in the record as to the stumpage and the value thereof, nor the time at which the timber was removed. The Court under the circumstances is constrained to deny any awarding of damages for timber taken by this defendant in this suit.
"Let a decree in accordance with the views herein expressed be prepared and *312 presented to this Court in open Court for execution."
A reading of the record shows that the factual findings of the Lower Court are amply substantiated. We are firmly of the opinion that the evidence offered by the plaintiff herein establishes that the plaintiff was informally acknowledged by her mother, Lonnie Blueeyes, during her lifetime and on her deathbed. This is not a case where the deceased only made casual reference to her alleged daughter or child on only one occasion but this is a case where we find the record to be that plaintiff's mother made reference and acknowledged the plaintiff as her child when the child was turned over to Millie Jackson when the plaintiff was only eighteen months old. There is no dispute and it must be assumed as a fact that plaintiff lived with her mother during these eighteen months. It must be remembered that when plaintiff was turned over to Millie Jackson that the said Lonnie Blueeyes was then ill and she died shortly thereafter from said illness. It likewise appears that it was common knowledge around the neighborhood and area that the plaintiff was the daughter of Lonnie Blueeyes. It likewise appears by the testimony of at least two witnesses that Lonnie Blueeyes, on her deathbed, acknowledged the fact that Laura, the plaintiff herein, was her child. Therefore, we have more than just one casual acknowledgment and for that reason we are of the opinion that Lonnie Blueeyes informally acknowledged the plaintiff herein as her daughter during her lifetime in the mode prescribed by the jurisprudence of this state and that the judgment of the Lower Court should be affirmed. It appears to us that the acknowledgment made by Lonnie Blueeyes on her deathbed is very strong and one that would not be made at such a time unless it was true and unless she intended to acknowledge the plaintiff as her child. The truthfulness and credibility of plaintiff's witnesses were resolved in favor of plaintiff by the Lower Court and we cannot find sufficient testimony or evidence in this record to dispute that credibility. Therefore for the above and foregoing reasons, the judgment of the Lower Court is affirmed at defendants' costs.
Judgment affirmed.
TATE, J., recused.
DALFERES, Judge ad hoc (dissents).
I am in accord with the majority opinion in holding that plaintiff may establish acknowledgment informally. I am compelled to differ in the conclusions reached in the majority opinion.
A review of plaintiff's evidence may be stated briefly as follows:
Decedent left the small community of Bradley in a pregnant condition and went to the home of Mattie Davis, where the plaintiff was born; that when the plaintiff was approximately eighteen months old she took the child to the home of her maternal aunt, Millie Jackson, who lived at LeCompte, Louisiana. Decedent stated to Millie Jackson that she desired her to raise the baby as her own; that the baby was left with Millie Jackson for the reason that decedent wanted to work and was sick; within a short time thereafter, but the exact period is not shown in the evidence, decedent returned to the community of Bradley and died at the home of Lessie Simon, who lived in the old family home at Bradley; that during her last illness she declared to those who visited her that she had a child and that she had given the child to a cousin who lived in the country near LeCompte.
I am of the opinion that it is only the affirmative acts and actions of a parent during the life of the child or the life of a parent, if the parent predeceases the child, which can be considered in determining whether the parent has informally acknowledged the illegitimate child.
A review of the decisions of our courts on this subject from the early case of Succession of Vance, 1903, 110 La. 760, 34 So. 767, *313 to the case of Allen v. Anderson, La.App. 1951, 55 So.2d 596, supports this position.
In the Succession of Vance, supra, the Court held that proof of birth, together with a declaration by a parent of paternal descent, was not sufficient evidence to constitute an informal acknowledgment to elevate an illegitimate child from the status of bastard to that of natural child, a prerequisite before the child could inherit under Articles 918 and 919, Revised Civil Code.
It is worthy of note that in each succeeding decision our courts have reviewed the evidence and have painstakingly quoted the affirmative acts or actions taken by the parent or parents where the issue was resolved in favor of the illegitimate child.
Briggs v. McLaughlin, 1913, 134 La. 133, 63 So. 851, 853; Taylor v. Allen, 1922, 151 La. 82, 91 So. 635; Murdock v. Potter, 1924, 155 La. 145, 146, 99 So. 18; Succession of Falls, 1925, 4 La.App. 10; Ford v. Calhoun, 1927, 6 La.App. 350; Succession of Tyson, 1937, 186 La. 516, 172 So. 772; State v. De Lavallade, 1949, 215 La. 123, 39 So.2d 845; Allen v. Anderson, La.App.1951, 55 So.2d 596.
In Briggs v. McLaughlin, supra [134 La. 133, 63 So. 852], the Court noted:
"* * * but, it is admitted, and is placed beyond dispute by the evidence, that she was his mother, and that, from the date of his birth until her death, in (about) 1909, she openly, publicly, and uninterruptedly recognized him as her son, as did also the other parties to this litigation."
In Taylor v. Allen, supra [151 La. 82, 91 So. 644], the Court found:
"For passing upon these questions the only facts necessary to be known are that Lillie Taylor is the child of Lona McGee and was raised by her as her daughter, and therefore acknowledged by her in every way except in one of the above mentioned modes."
In Murdock v. Potter, supra, the Court observed:
"Plaintiff was born on March 20, 1889. His mother was Fannie Williams, a colored woman, who at the time of plaintiff's conception and birth was unmarried, and his father was Dave Murdock, a single man, of the Caucasian race. Plaintiff lived with his mother until her death, which occurred in the year 1896. The mother acknowledged plaintiff orally as her child, cared for him, and held him out to the world as such."
In Succession of Falls, supra (Under Art. 922 LSA-C.C.), the Court found:
"The proof shows that Simonette Reason was the child of Mary Bingham, was recognized by her mother as her child and was generally known as such in the community where they lived. It is equally well established that Simonette Reason, deceased, was never acknowledged by her mother, Mary Bingham, either by a declaration in a notarial act or by baptismal registry, as provided for in Article 203, [LSA] C.C. The question presented for decision is as to whether or not the rearing of Simonette Reason as her child by Mary Bingham was such an acknowledgment as to entitle her to be called or classed as a natural child and, upon her death, without posterity, whether her mother was vested with the right of inheritance, entitling her to claim the estate of her deceased daughter under [LSA] C.C. Art. 922. This presents the vital issue in the case.
"As it has been shown by the evidence that Simonette Reason was a child of Mary Bingham and had always been recognized as such by the mother, such proof would have been sufficient to show an acknowledgment by her mother, and would have entitled her to inherit from her mother without proof of an acknowledgment by a notarial act or baptism, as prescribed by Art. 203, [LSA] C.C." (Emphasis supplied)
In Ford v. Calhoun, supra, a case cited by the majority opinion in support of their findings, the Court said:
"On the point as to whether the father, Simon Ford, acknowledged his *314 son, Norman, the plaintiff in this case, there were eleven witnesses who testified directly on that point. Among them were colored people ranging in ages all the way from fifty-three to seventy-seven years, each of whom having known plaintiff and his father from the early childhood of the plaintiff down to the time that the suit was tried.
"Among these are Jim Ford, seventy-five years old; Ara McCoy, seventy-seven years old, both illegitimate children of Simon Ford, but were not acknowledged by him, and who claim no interest in his succession; and Mitchell Ford, another son, who was acknowledged by him and who owns an undivided one-fourth interest in his succession. Also Pauline Calhoun, a stepdaughter of Simon Ford and one of the defendants in this case, and her husband, Charlie Calhoun.
"These witnesses, together with others, testify that Simon Ford, the father, had repeatedly told them that Norman was his son; that he always referred to him as his son, and at times called him his favorite son.
"A number of these witnesses testify that Simon had kept Norman in the house with him while a child and had reared him as his son. It is in evidence that the child's mother died when he was an infant and that his father carried him to a woman named Mariah to be cared for. That later, when the father took up with another woman, he demanded custody of his child and probably had a lawsuit with Mariah in order to obtain his custody, but finally got him, took him home and kept him.

"Some of the witnesses swore that about 1874 (the boy was born in 1864) he acted as carriage boy for some white people and lived with the "white folks", but that during that time he visited his father constantly.
"One of the witnesses testified that the father always claimed the boy as his own but said he was hard to keep at home; that he would run away, and that the father had to go and get him and bring him back. This was when the boy had grown almost to manhood.
"Each and every one of the witnesses who claimed to know the family said that it was generally recognized and understood in the community where they had lived that Norman was the son of Simon." (Emphasis supplied.)
In Succession of Tyson, supra [186 La. 516, 172 So. 780], the Court said:
"We think the record shows that all of Louisa Gibson's children were duly acknowledged by her in accordance with the jurisprudence of this state. She not only openly and publicly acknowledged that they were her children, but reared and treated them as such until the date of her death, and they were therefore raised to the status of natural children, capable of inheriting from her."
In State v. De Lavallade, supra [215 La. 123, 39 So.2d 847], the Court found:
"But in the stipulation of facts there is incorporated the record of the succession proceedings, as evidence for the trial of the exceptions. And in that record are the affidavits of four individuals swearing that Mary Lafargue always treated John B. Lafargue as her son, and that he was generally known to be her son."
In Allen v. Anderson, supra, the Court reviewed at length the attitude of the mother toward the child and the act of partial abandonment for a short period. It may be implied from this statement of the case that had the mother not returned for the child the court may not have considered her original rearing of the child as an acknowledgment, but that her action in returning for the child definitely demonstrated her desire to acknowledge the child.
*315 The Court said [55 So.2d 599]:
"However, the evidence clearly shows that Beatrice Chandler Hills, who was born in 1900, was informally acknowledged by her mother to be her daughter. After the death of Willie Chandler, who died when the child Beatrice was three years old, Belle Frazer left the child in Patterson and came to New Orleans. Unquestionably she left her child only temporarily, for we find that a few years later she returned to Patterson and brought the child to New Orleans. Beatrice Chandler Hills continued to reside with her mother at least up to the time that Belle Frazer contracted marriage in 1921 with Richard Raney. Beatrice Chandler Hills says that her mother `raised' her, and it is not to be doubted that during all of those years that Beatrice Chandler Hills lived with her mother, Belle Frazer treated her and held her out as her natural child * * *."
The majority opinion in holding that plaintiff was duly acknowledged, relies on the statement of the deceased at the time that the baby was delivered to Millie Jackson for rearing and certain statements made on her deathbed. I am of the opinion that this is not the public acknowledgment required to constitute an informal acknowledgment. A careful reading of the evidence indicates that decedent's actions were secretive rather than of a public nature. She left her home community in a pregnant condition to give birth to the child in a strange community. No one who testified saw the child from birth to the time the child was delivered to Millie Jackson. We think this is significant. The first evidence that Millie Jackson had of the birth of the child was at the time the child was delivered to her, and the schoolmate of decedent did not see the child until the child was ten (10) years old. There is not a scintilla of evidence in the record which would indicate that decedent held plaintiff out publicly as her child or reared the child as her own from the birth of the child to the death of the decedent. It is for this reason that I am unable to reach the conclusion found in the majority opinion that decedent duly acknowledged plaintiff.
The affidavit of Mattie Davis, though timely objected to, is considered in its entirety. At best, it merely shows that plaintiff is the child of decedent.
The majority opinion assumes that plaintiff lived with her mother during the eighteen (18) months between the birth of plaintiff and the delivery of plaintiff to the home of Millie Jackson. The burden of proving acknowledgment was upon plaintiff. There can be no assumption or presumption, therefore, in favor of plaintiff on this vital issue. If plaintiff had any evidence of the conduct of decedent during these eighteen months toward the plaintiff, it is reasonable to suppose that plaintiff would have submitted this evidence.
"As has been many times declared by the several courts of this State, probabilities, surmises, speculations and conjectures cannot be accepted as sufficient grounds to justify recovery on the part of a plaintiff who is charged with the burden of proof." Pinkney v. Cahn Inv. Co., La.App., 32 So.2d 345, 347.
In many cases of this nature it is necessary to obtain evidence of attitude and conduct of the parent toward the child after a lapse of sixty, seventy, or eighty years, but in this case, plaintiff was only called upon to obtain evidence of a situation which had occurred twenty-four (24) years prior to the trial.
I am unable to attach the significance to the deathbed statement of the decedent that is given to that statement in the majority opinion. If decedent had publicly acknowledged plaintiff as her child and had reared her as such, what would be the necessity for the decedent, on her deathbed, to inform her relatives and friends that she had *316 given birth to a child who was with an old person near LeCompte?
For these reasons we are of the opinion that plaintiff, having the burden of proving an informal acknowledgment, has failed to do so, and for that reason I must respectfully dissent from the majority opinion.