540 So.2d 1002 (1989)
Calvin WALKER, Appellee,
v.
Sarah WASHINGTON, Appellant.
No. 20086-CA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1989.
Desmond E. McGinn, Shreveport, for appellant.
Murphy J. White, Mansfield, for appellee.
Before FRED W. JONES, Jr., SEXTON and HIGHTOWER, JJ.
FRED W. JONES, Jr., Judge.
This is a custody dispute over an illegitimate child whose mother died on July 4, 1986. After her sister's death, Sally Washington took her niece to Houston to live in her home. Calvin Walker, the biological father who was living with the child's mother when the mother conceived, when *1003 she gave birth, and when she died, had his name entered on the child's birth certificate as "father", filed a Writ of Habeas Corpus, and petitioned the court for the permanent legal custody of the child. Sarah Washington filed an exception of lack of jurisdiction claiming the child had lived in Texas for six months and Texas was the home state.
The trial judge denied the exception, stating Louisiana, at a minimum, had concurrent jurisdiction with Texas since the child had so many significant connections with Louisiana. Ms. Washington then answered the demand and filed a reconventional demand requesting custody of the child pursuant to La. C.C. Art. 256. After the hearing on the custody matter, the trial court granted custody of the minor to Walker, finding him to be her biological father who had informally acknowledged his child before her mother's death, and formally acknowledged his child after her mother's death.
Factual Context
Sally Washington and Calvin Walker lived together for eight years. During this time Walker was a steady employee except for a short time between jobs when the Georgia Pacific mill in Logansport, Louisiana, was closed.
Sally conceived and bore the one child who is the subject of this litigation while she was living with Walker. She gave birth to the child on August 12, 1982 at LSU Medical Center in Shreveport. The birth certificate filled out by Sally at the time of birth described the mother as single and did not name a father. Until her death from a heart attack on July 4, 1986, Sally Washington received welfare and aid to dependant children on behalf of the child.
During the time the deceased mother and Walker lived together, Walker was married to another woman, Lula Hunt Walker. This woman began living with another man and bore his child. No legal dissolution of the marriage was completed, although a petition for separation was filed by Walker in 1977.
While still legally married to his first wife, Walker was convicted of a crime and served a prison term. After being released from prison, he returned to Mansfield, Louisiana, where his wife and parents lived. He fathered a child who lived in Houston with his natural mother. Subsequently, Walker began living with Sally Washington.
Walker did not marry Sally before her death. He did offer to marry her and assisted in supporting both Sally and his daughter by providing housing and other necessities. The child and her mother lived with Walker continuously until her mother's death.
Walker testified Sally Washington did not have to accept welfare and aid to dependent children to support the child, but chose to do so. In fact, both Walker and his mother testified he had asked Sally to marry him and had bought her a wedding ring. The Washington family members who testified did not refute Walker's offer to marry Sally before her death. Walker testified Sally's family had advised her that it would not be prudent for her to give up her welfare benefits to marry Walker.
On July 4, 1986, Sally Washington died of a heart attack. Her sister, Sarah Washington, claimed she discussed taking the child to Houston to live with both the child's mother before her death and with Walker while she and Walker were at the home of another sister, Ruthie Jones. When asked why she discussed her taking the child with Walker, she testified she asked him because her sister "was living with" Walker when she died.
Walker denied giving Sarah Washington permission to take his child to live with her in Houston. In fact, he testified Ms. Washington asked him to allow the child to spend a "couple of nights" with her, not go to Houston on a permanent basis. When Walker went to the home of Sally and Sarah Washington's father to pick up his daughter on the second night, their father told him Ms. Washington had taken the child to Houston early that morning. Walker immediately went to the home of the third sister, Ruthie Jones, and asked her why Ms. Washington had taken the *1004 child. Ruthie Jones could not adequately answer Walker's questions.
Wanting his child returned, Walker went to the DeSoto parish sheriff's office and filed a kidnapping report on July 22, 1986. He testified the officers advised him not to go to Houston and merely take the child back since this type of action could get Walker in trouble with Texas authorities.
Walker next sought legal advice. The lawyer reportedly told Walker not to go to Houston and take the child, but to pursue legal avenues to obtain the return of the child.
Walker's mother supported his testimony that he did not give permission for the child to move to Houston. Jessie Bell Walker also testified she had assisted in taking care of the child while Walker worked and would continue to care for her while he worked and when he needed assistance. When Ms. Washington took the child, Mrs. Walker testified she had been keeping her and had many of her clothes at her house. She testified Ms. Washington never came to get the child's clothes from her home or from Walker's as she would have if it had been a permanent change of domicile.
Nevertheless, the child was taken to Texas and began to live with her aunt. Walker testified he called almost once a month for a number of months to find out when Ms. Washington would return the child to him in Mansfield. Although Ms. Washington allowed him to talk to the child, she never answered his question concerning her return to Mansfield, nor would she return the child or bring her to Mansfield to visit her relatives.
Ms. Washington testified Walker called once a month or so until March of 1987, and then began calling once every other month. Both Walker and his mother admitted they did not send money, gifts or birthday cards to the child in Houston, but refrained from doing so in anticipation of her return to live with Walker.
Advised he would need a birth certificate naming him as the child's father to obtain a legal disposition of his problem, Walker filled out the required forms with two witnesses for his signature and one witness who was aware he was the father of the child and proceeded to wait 3½ months for the birth certificate. The new certificate was issued on March 2, 1987. Walker was listed as the natural father of the child.
Procedural History
After Walker received the birth certificate listing him as the child's natural father, he obtained new counsel, filed a habeas corpus action on April 13, 1987, and attempted to obtain the court order required to receive police assistance in retrieving his daughter.
Upon being served in Houston with the original petition in the instant proceeding, Ms. Washington contacted an attorney and filed proceedings in Texas on May 1, 1987, claiming Texas was the home state of the child. She requested an injunction prohibiting Walker from removing the child from Texas.
In response to the Louisiana suit, Ms. Washington filed an exception of lack of jurisdiction stating the child had lived in Texas in excess of six months. The trial court judge denied the exception stating that jurisdiction, at a minimum, was concurrent since the child had substantial contacts with Louisiana. At the hearing on the jurisdictional question, Ms. Washington testified she had not contacted an attorney until she had been served with notice of the pending proceedings in Louisiana although her petition in Texas declared she was not involved in any litigation involving this child in another jurisdiction.
After the hearing on the merits of the Writ of Habeas Corpus, the child custody issue, the court in written reasons for judgment found Walker was the child's natural father, and he had informally and formally acknowledged her. The trial judge held Walker did not allow the child to leave the state with her aunt on a permanent basis nor had he abandoned the child. This conclusion was supported by the father's numerous attempts to legally retrieve the child.
Moreover, the trial judge found Walker was a fit and moral person to raise the child. Local members of the mother's family *1005 conceded Walker was a good father and provided for the child. The trial judge noted Walker appeared deeply concerned for the welfare of his child as he testified. He found the father was an honest, hard worker who was ready to provide a stable home for her.
The trial court held the father had acknowledged the child informally before the mother's death and formally after the mother's death. He found the natural father's right to custody of the minor child to be paramount and explained:
"Article 256 does not require a formal acknowledgment. See La. Civil Code Art. 209; also Succession of Levy, 428 So.2d 904, La.App. 1st Cir. (1983); Goins v. Gates, 93 So.2d 307 (1957); and In Re. Wildeboer, 406 So.2d 687, La.App. 2d Cir. (1981), and Durr v. Blue, 454 So.2d 315, La.App. 3rd Cir. (1984).
It would seem grossly unfair to, in essence, punish a natural father who had otherwise nurtured and supported his child, but had failed to execute a formal act of acknowledgment by granting a custodial preference to a sibling vying for custody. The preference rule outlined in Civil Code Article 256 was obviously designed to address a situation where the natural father had not, prior to the mother's death, exhibited a caring interest in the child, or had disclaimed his paternity."
On appeal, Ms. Washington claims La. C.C. Art. 256 gives her, a sibling of the child's deceased mother, a paramount right to the custody of the child since the father did not formally acknowledge the child while the mother was living. While Ms. Washington could not cite an instance showing why Walker would be an unfit parent, and she admitted he was a good father, she maintained it would be in the child's best interests for her to rear the youngster.
Appellant's only assignment of error is that the trial court committed manifest error in awarding the custody of the minor child to her natural father rather than to the sister of her mother.
Requirement of "Acknowledgement"
La. C.C. Art. 256, found under the Civil Code Title VIII, Chapter 1, "Of Minors, Of Their Tutorship and Emancipation", provides in pertinent part:
B. After the death of the mother, if the father had not acknowledged the child prior to the mother's death, the court shall give first consideration to appointment as tutor either of her parents or siblings who survive her and accept the appointment, and, secondly, the father, always taking into consideration the best interests of the child.
"Acknowledgment" is defined in La. C.C. Art. 203, found under the Civil Code Title VII, Chapter Three, "Of Illegitimate Children", and provides:
The acknowledgment of an illegitimate child shall be made by a declaration executed before a notary public, in the presence of two witnesses, by the father and mother or either of them, or it may be made in the registering of the birth or baptism of such child.
"Informal" acknowledgment is recognized by reference in our code (See La. C.C. Art. 198). It was created and defined in our jurisprudence, particularly in succession cases. McDermott v. Funel, 258 La. 657, 247 So.2d 567 (1971); State v. De Lavallade, 215 La. 123, 39 So.2d 845 (1949). The simple proposition presented in these cases allowed an illegitimate to establish proof that he was acknowledged by a parent by means other than that prescribed in La. C.C. Art. 203.
In McDermott, supra, the court held an informal acknowledgment of an illegitimate child met the statutory requirements to elevate the child from an unacknowledged "bastard" to an acknowledged illegitimate child. Succession of Levy, 428 So.2d 904 (La.App. 1 Cir.1983), recognized acknowledgment of an illegitimate child may be informal. In Levy the father continuously acknowledged the child and it was generally believed in the community the deceased was the biological father.
In amended La. C.C. Art. 209, dealing with filiation required for illegitimates to inherit from their natural parents, the Code *1006 specifically requires acknowledgment under La. C.C. Art. 203. If acknowledgment is informal, the child's rights are not denied, but informal acknowledgment is not self-proving for succession purposes and filiation must be proven in a civil proceeding within certain time frames.
In La. C.C. Art. 245, which provides La. C.C. Art. 146 applies to a custody dispute between the parents of an illegitimate child whose parents have formally acknowledged him or her, the Code once again requires a specific type of acknowledgment.
Arguably, if the Civil Code does not specifically require acknowledgment under La. C.C. Art. 203, then acknowledgment may be informal as defined by Louisiana jurisprudence and referred to in the Civil Code, or "formal" as defined by La. C.C. Art. 203.
Constitutional Rights of Natural Parents
The extent to which the Constitution affords protection to the relationship between a natural father and his illegitimate child has been discussed in several cases. See Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
Where the father has demonstrated a full commitment to the responsibilities of parenthood by coming forward and participating in the rearing of his child he is afforded protection under the due process clause of the Constitution. (Lehr, supra; Caban, supra; Stanley, supra.)
When the mother of an illegitimate child is deceased, and a father claims the illegitimate child as his, (supported by a history authentic enough to prove filiation in a Louisiana succession proceeding), the father of the illegitimate child should be protected by the reasoning of Caban, supra. Without compelling state reasons for a formal rather than an informal acknowledgment of an illegitimate child to protect the father's paramount right to custody of his illegitimate child living with him and reared by him, La. C.C. Art. 256 would be unconstitutional since it does not provide equal protection for the caring father of an illegitimate child and the father of a legitimate child.
Louisiana courts have implicitly interpreted this due process right to bestow upon a parent "the paramount right to the custody of the child" and courts are allowed to deprive a parent only when there are compelling reasons. Wood, infra; Deville, infra.
Parental Rights to Custody of Natural Children
Historically, Louisiana's rule of law, enunciated in Wood v. Beard, 290 So.2d 675 (La.1974) and followed by this court in State in the Interest of Taylor, 296 So.2d 841 (La.App. 2d Cir.1974), writ refused, 299 So.2d 799 (La.1974); Lacroix v. Cook, 383 So.2d 59 (La.App. 2d Cir.1980), writ denied, 384 So.2d 801 (La.1980), grants the natural parent of the child the paramount right to the custody of the child. This paramount right to custody has been extended to parents of illegitimate children as well. Deville v. LaGrange, 388 So.2d 696 (La.1980).
In custody disputes after separation and divorce the courts look to La. C.C. Art. 146 which provides in pertinent part:
B. Before the court makes any order awarding custody to a person or persons other than a parent without the consent of the parent, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interest of the child.
This court, in Boyett v. Boyett, 448 So.2d 819 (La.App. 2d Cir.1984) held:
"... under Art. 146 as amended by Act 307 or 1982, a parent now enjoys a paramount right of custody which can be outweighed by a sufficiently grave detriment to the child's best interest, present in awarding custody to that parent, which requires that custody be awarded to a non-parent."
In litigation under La. C.C. Art. 146(B), "detrimental" has primarily focused on *1007 "prolonged" parent-child separation, forfeiture of parental rights, drug or alcohol use, or a "totality of circumstances" evaluation that deemed parental conduct detrimental to the child's welfare. Moreau and Chin-Chin Ho, "Child Custody Awards to Nonparents under Article 146(B)", 33 Loy. L. Rev. 51 (1987).
Previously, La. C.C. Art. 146 was only applied to custody disputes incidental to divorce and separation litigation. Monreau and Ho, supra. However, in 1983 the legislature added La. C.C. Art. 245 which extended the Art. 146 standards to proceedings where custody of a formally acknowledged illegitimate child is sought by both parents. The standards of La. C.C. Art. 146(B) must, at least, be adopted as guidelines in this custody dispute between a parent and a non-parent involving the informal acknowledgment of an illegitimate child.
Moreau and Ho, supra, also note that intact families have a legitimate expectation of being left alone absent grounds for state intervention under neglect statutes. These authors believe it is doubtful the legislature intended to subject married or common law parents to vexatious custody litigation by non-custodial strangers.
Ms. Washington's taking of the child and keeping her for a period of more than a year does not prohibit the child from being returned to her father. In Boykin v. Corless, 488 So.2d 1153 (La.App. 2d Cir. 1986), a father regained custody despite the grandparents' claim 4½ years of bonding to them should not be separated. There the court found there would be a temporary detriment to the child but custody was awarded to the parent because parental custody would not cause a serious or long-term detriment. Boykin holds that non-permanent detriment and disruption do not outweigh a fit parent's superior right to custody under La. C.C. Art. 146(B). Moreover, the court requires a non-parent to prove that an award to a parent would be detrimental to the child and an award to the nonparent is required to serve the child's best interest. See Boyett, supra.
To abrogate the natural father's right to custody of his illegitimate child, Louisiana's Supreme Court has placed the burden of proof on the party seeking custody to prove the parent has forfeited his or her right to parenthood, that he or she is unfit, or that he or she is unable to provide a home for the child. Deville, supra.
Because Deville was a 4-3 decision that did not consider La. C.C. Art. 256 (which was not in effect at the pertinent time), appellant contends Deville was legislatively overruled by La. C.C. Art. 256, and Ms. Washington, as Sally Washington's sibling, has a paramount right to the custody of this child. This argument does not appropriately address the meaning of "acknowledgment" in La. C.C. Art. 256.
In this case, the trial court found the father had not granted the child's aunt permission to take her from Louisiana or from his care. Immediately upon learning the child had been taken from him, he began pursuing legal steps to retrieve the child: he contacted the sheriff's office, he hired legal counsel, he repeatedly telephoned the aunt to return the child, he traveled to Houston to seek assistance from Houston police, and he began legal proceedings to obtain the court order required by the Houston police to assist him in having the child returned to his custody. These efforts to regain custody of the child after she was taken without his permission and his history of having provided for both the child from birth and her mother for eight years prior to her mother's death do not indicate this father had forfeited his parental rights, abandoned the child or was unable to provide a home for the child.
In the testimony of both the witnesses who appeared in support of Walker and the witnesses who appeared on behalf of Ms. Washington, no one could assert a legitimate instance of Walker's parental unfitness other than his conviction of a crime in 1977. Since that conviction and jail term, and during the entire time Walker and Sally lived together, there was no evidence of any type of criminal activity. The record does contain evidence of steady employment, *1008 consistent habitation, and parental caring and concern.
No one has seriously questioned Walker's contention he was the child's natural father; Sally's sister Ruthie Jones testified Sally told her Walker was the father. Walker took Sally to the hospital and was present when the child was born. He took them to their common home when they were released from the hospital, and the three of them lived together continuously until Sally's death. Walker actively participated in rearing the child from birth until her aunt took her out of Louisiana without permission; he did not give up his parental rights; he immediately pursued legal avenues to obtain the child's return.
Conclusion
It is in the best interest of a child to remain in the custody of a caring parent unless that parent's custody would be so detrimental to the child that custody must be awarded to a non-parent. La. C.C. Art. 256 does not require "formal" or La. C.C. Art. 203 acknowledgment. A caring father of an illegitimate child has protection equal to that of a caring father of a legitimate child under the Constitution. The parent of an intact family, whether his child is legitimate or illegitimate, has an expectation of non-interference absent neglect.
The trial court's ruling the father did not abandon his child or grant the aunt permission to move the child to Texas permanently is supported by the record. The father reared the child from birth in a home he provided for the mother and their child. As soon as he discovered the child had been removed, he actively and legally sought the return of the child. This father cares for his child and is prepared to provide a home for her.
For these reasons, the judgment of the trial court is AFFIRMED, at appellant's cost.