454 So.2d 315 (1984)
Raymond DURR, Et Al., Plaintiffs-Appellees,
v.
James BLUE, Et Al., Defendants-Appellants.
No. 83-716.
Court of Appeal of Louisiana, Third Circuit.
July 17, 1984.
*316 Harrington & Harrington, C. Rodney Harrington, Natchitoches, for defendant-appellant.
Sarah J. Campbell, Kisatchie Legal Service Corp., Natchitoches, for plaintiff-appellee.
Before DOMENGEAUX, FORET and STOKER, JJ.
STOKER, Judge.
The issues before us in this appeal concern the paternity of three minor children, the validity of an act of adoption by which defendants purported to adopt the three children, and the award of custody of the children to their alleged biological father. The trial court found that (1) Raymond Durr was the biological father of the three minor children, (2) the act of adoption by which James and Hazel Blue attempted to adopt the children was null and void, and (3) Raymond Durr is entitled to custody of the children. Defendants, James and Hazel Blue, appeal and we affirm.

FACTS
The three children who are the subjects of these actions are Sue Ann Durr, born August 21, 1972, Leslie Dianne Durr, born March 30, 1975, and Misty Raye Durr, born December 29, 1976. Each child's birth certificate shows Raymond Durr as her father. The children's mother is Donna Sue Ammons.
Ms. Ammons married Victor Anders on August 2, 1971, and lived with him only a short time. She met Raymond Durr in the *317 early part of December of that same year, and they began living together as husband and wife. Ms. Ammons and Mr. Anders were not legally separated or divorced during the period she lived with Mr. Durr, which was from December of 1971 until January of 1977. During that time Mr. Durr and Ms. Ammons had brief separations; and when Mr. Durr was released from prison in December of 1976, after serving three months, they no longer lived together.
By documents dated July 11 and 12, 1977, Ms. Ammons and her legal husband, Victor Anders, transferred custody of the children to the Blues. One of the documents signed by Mr. Anders and Ms. Ammons states in part:
"Victor Lee Anders is the legal father of said children because the marriage has never been judicially separated or divorced. However, Victor Lee Anders is not the actual father of said children."
By documents dated November 8, 1978, Ms. Ammons stated that she wished to remove the children from the custody of the Blues and place them with Raymond Durr and his new wife, Doris. A portion of one of the documents reads as follows:
"Appearer [Ms. Ammons] does further, and by these presents, agree that RAYMOND DURR, who is the biological father of these children, and who has raised them from their birth, is and should be entitled to full custody and control of these children and Appearer does hereby consent and agree to their adoption by RAYMOND DURR and DORIS DURR at whatever time they choose."
The Blues apparently refused to relinquish custody of the girls to the Durrs, and the Durrs filed a writ of habeas corpus seeking custody of the girls on December 12, 1978. The Blues reconvened seeking custody, and Ms. Ammons joined the suit as a party-plaintiff on January 17, 1979, asking that custody be given to Raymond Durr. On January 31, 1979, all parties asked that the matter be held in abeyance until April 1, 1979, in order to give them an opportunity to reach a settlement.
On December 18, 1979, Mr. Durr filed a motion seeking visitation privileges, and a hearing was set for January 25, 1980. On January 24, 1980, the Blues obtained a continuance of the matter on the basis that Hazel Blue had just undergone surgery and could not appear. In a separate proceeding before another trial judge, the Blues filed a petition for adoption of the children on January 24, 1980, the same day the continuance was sought in the suit before us here. An affidavit of consent was filed in the adoption case signed by Ms. Ammons and Mr. Anders. A final decree of adoption was rendered on March 26, 1980. It is not disputed that Mr. Durr had no notice of these adoption proceedings.
On December 18, 1981, Raymond and Doris Durr filed a petition for a rule to show cause why they should not have visitation privileges. In response, the Blues filed an exception of no right or no cause of action claiming that Victor Anders was the legal father of the girls and they had become the adoptive parents. The matter was again continued on motion of the Blues and on December 29, 1982, after obtaining new counsel, the Durrs filed a motion seeking to have the adoption declared null and again seeking custody of the girls. The Blues again filed an exception of no right of action making the same allegations. Judgment was rendered in favor of the Durrs, as previously stated, and this appeal followed:
The matters before us for determination are:
1. Whether or not Raymond Durr is the biological father of Sue Ann, Leslie, and Misty,
2. Whether or not the adoption proceeding by the Blues is valid, and
3. Whether the Durrs are entitled to custody.

PATERNITY
In support of their exception of no right or cause of action, the Blues assert that *318 because of the presumption established in LSA-C.C. art. 184 Raymond Durr cannot sue for custody or attack the adoption. Article 184 provides:
"The husband of the mother is presumed to be the father of all children born or conceived during the marriage."
It is not disputed that at the time of each child's birth Ms. Ammons was still married to Victor Anders, although physically separated from him. However, Louisiana courts have recognized that there can be cases in which children may enjoy dual paternity rights. Warren v. Richard, 296 So.2d 813 (La.1974) and Succession of Mitchell, 323 So.2d 451 (La.1975). These cases involve children whose fathers were presumed to be the husbands of their mothers, but who were in fact the biological children of other men. In Warren, the Court recognized the right of a child to recover for the wrongful death of its biological father, and in Mitchell the Court recognized that children have rights to the succession of their biological father. In both cases, there had been no disavowal action by the husband of the mother who was presumed to be the legal father of the children, thus leaving a situation in which the children could possibly enjoy dual paternity rights. In regard to this problem, the Court in Warren made these comments:
"The argument is made that this result will accord more rights to this child than are ordinarily accorded the legitimate childthat she will be able to recover for the death of her biological father as well as for the death of Albert Gray, because the law deems her his legitimate offspring. However, this concept is not unique to our law. It is specifically provided that the adopted child, upon his adoption, is not divested of his right to inherit from his blood parents while at the same time he inherits from the adoptive parent. La.Civil Code art. 214.
"We are not unmindful of the problems a logical extension of these holdings may create, such as a child in these circumstances recovering from both fathers for support and maintenance, or, conversely, requiring the child to support both fathers in a proper case. La.Civil Code arts. 227, 229. But we are influenced in this decision by the constitutional principles announced by the United States Supreme Court to which we adhere."
It can be seen from the above discussion that the presumption provided for in Article 184 has not been inflexibly construed so as to deny the rights of children whose fathers were in fact not the husbands of their mothers. Likewise, we do not believe that it should be construed so as to automatically deny the parental rights of a biological father, particularly in a case such as this where there is substantial proof of paternity, and there is no serious claim that the husband of the mother is the biological father of the children.
In an action to disavow, a husband who is presumed to be the father under Article 184 may succeed by proving by a preponderance of the evidence any facts which reasonably indicate that he is not the father. LSA-C.C. art. 187. This standard of proof was discussed in Ogea v. Ogea, 378 So.2d 984 (La.App. 3rd Cir.1979), writ denied, 379 So.2d 1104 (La.1980). This Court considered Articles 184 and 187 and determined that the presumed legal father could disavow only if he could present reliable scientific proof that he could not be the father, or prove that he lacked the opportunity to have intercourse with his wife at the probable time of conception. We do not think that such a strict standard should be applied to a man seeking to "avow" his biological children, but that he should be allowed to show that, more probably than not, he is the father. The failure of the presumed legal father to timely bring a disavowal action should not operate to deny the biological father his parental rights. Such a result would be a violation of the due process provisions of the United States and Louisiana Constitutions. (See our discussion of adoption, infra.)
Moreover, we should note by way of summary that the proof made by the biological father of his actual paternity does *319 not operate to legally "bastardize" the children. They are legitimate in every legal sense because of the presumption provided by Article 184. There is no contest here between fathers. The contest is for custody only, and neither the legal father nor the mother (legal as well as biological) are claiming the custody. The "avowal" of paternity by plaintiff, Raymond Durr, does not operate as a disavowal on behalf of the legal father, Victor Anders. In the litigation represented by this lawsuit, Raymond Durr cannot become the legal father, and we know of no way he can become the legal father except through adoption procedures provided by law.
Counsel for the defendants expresses concern over the fact that (for purposes of this action) proof is allowed to show that the presumption of Article 184 is in fact not true. There was a day, perhaps, when the presumption foreclosed proof contrary to the presumption. Today we must take into account constitutional considerations, to say nothing of changing social outlook. If the fixed presumptions embodied in our Civil Code appear to be in the process of being undermined by constitutional considerations, we must nevertheless bow to higher authority on that point. If there is any inconsistency, which we do not concede, we deem it our duty to make required accommodations in favor of what has been determined to be constitutional rights of biological fathers. Hence, they have a right to prove their biological relationship to their children for certain purposes despite the apparent rigidity of Article 184.
The facts we have to consider on this issue are as follows: The evidence in this case shows that each child was given the name Durr at birth and each birth certificate named Raymond Durr as the father. Raymond Durr and Donna Ammons lived together as husband and wife from early in December of 1971 until the end of 1976. Although there was some testimony that the two experienced brief separations, we are convinced that the practical effect of the relationship was that they lived together continuously. During that time Mr. Durr acted as a father to Sue Ann and Leslie. He never had an opportunity to act as such to Misty because he and Ms. Ammons parted company just after her birth. Each of the three girls is now receiving Social Security benefits on Mr. Durr's account because he now has a disability.
Ms. Ammons has stated in several notarized documents that Mr. Durr is the girls' father. Sue Ann's baby book filled out by Ms. Ammons shows Mr. Durr as her father and his parents as her paternal grandparents. Also entered into evidence are letters written by Ms. Ammons to Mr. Durr's parents while she was in prison sometime between January of 1977 and January of 1979 which clearly indicate that Ms. Ammons accepted Mr. Durr as the biological father of the children.
At trial, Ms. Ammons contradicted all of the above, claiming that she was pregnant by Mr. Anders with Sue Ann when she met Mr. Durr and hinting that she had sexual relations with other unnamed men who fathered Leslie and Misty. In contrast to this testimony, Ms. Ammons told an employee of the State Department of Health and Human Resources who filed a report in the adoption proceeding by the Blues that Sue Ann and Leslie were fathered by unnamed men and Misty was fathered by Mr. Durr.
Considering all of the above, we find that the trial court was correct in determining that Mr. Durr is the biological father of all three girls. The facts reasonably indicate that conclusion and we find no clear error by the trial court.

ADOPTION
The purported adoption by the Blues was sought and obtained during the pendency of the proceedings initiated by Mr. Durr for custody of the children. Defendants admit that the adoption proceeded to a final decree without any notice to Mr. Durr. In light of our determination that Mr. Durr is the biological father of the girls, the adoption proceeding conducted *320 without notice to him must be found to have been a violation of his rights of due process guaranteed by the United States and Louisiana Constitutions.
In the recent case of Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the United States Supreme Court stated:
"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by `com[ing] forward to participate in the rearing of his child,' Caban [v. Mohammed], 441 U.S. at [380] 392, 99 S.Ct. [1760], at 1768 [60 L.Ed.2d 297 (1979) ], his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he `act[s] as a father toward his children.' Id., at 389, n. 7, 99 S.Ct., at 1766, n. 7."
In Lehr the Court determined that the unwed father was not denied due process or equal protection when he did not receive notice of adoption proceedings. In reaching this conclusion the Court noted that the unwed father did not live with the mother or child after her birth, his name did not appear on the birth certificate, he had never provided financial support, and he had never offered to marry the mother. His first interest in the child came when she was more than two years old, at which time he filed a petition asking for a determination of paternity, an order of support, and reasonable visitation privileges. This petition was filed a month after adoption proceedings had been instituted by the mother and her new husband. The facts of this case are in marked contrast with those of Lehr.
The case before us here is comparable to that before the United States Supreme Court in Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). In Caban an unwed father challenged a New York law permitting unwed mothers, but not unwed fathers, to block an adoption by withholding consent. The father in Caban had lived with the mother and the children as a family unit for several years, had been named as the father on the birth certificates, and had given financial support to the children. The Court held that, because a substantial relationship had been established with the children, the father in Caban had been denied equal protection.
Mr. Durr lived several years with Ms. Ammons, Sue Ann and Leslie as a family unit. He contributed to their support to the best of his ability. Although he has not been given the opportunity to be a father to Misty, he has continually sought custody of all three girls and continues to support them through his Social Security disability benefits. He was clearly named the father of each child on the birth certificates and has never denied that paternity.
To allow the children to be adopted by third parties without notice to Mr. Durr would be an unconscionable violation of his right to due process, particularly when that action was taken during his efforts to obtain custody. For this reason alone, the adoption must be declared null.
Although we do not address other arguments made on behalf of Mr. Durr as to the ineffectiveness of the adoption, we observe that they all appear to have merit. The procedures for adoption are set out in LSA-R.S. 9:421 et seq. Some apparent irregularities in the procedure conducted here are a lack of voluntary surrender by both parents required by LSA-R.S. 9:422.3, lack of act of surrender by the parents named on the birth certificate required by LSA-R.S. 9:422.4, no strict compliance with the requirements of the act of surrender set out in LSA-R.S. 9:422.6, and no service of notice of the filing of the adoption petition on each living parent required by LSA-R.S. 9:425. The trial court which granted the adoption also violated the requirement of LSA-R.S. 9:432 that the children live with petitioners at least six months after granting of an interlocutory decree. No interlocutory decree was granted in this case. The final decree of adoption was rendered on March 26, 1980, two months and two days after the petition for adoption was filed.
We note further that Mr. Durr's claim that the adoption should be declared null *321 pursuant to LSA-C.C.P. art. 2004, because it was obtained by fraud or ill practices appears to have merit. The Blues were well aware of Mr. Durr's claim of paternity and his attempts to obtain custody. In fact, their petition for adoption was filed on the same day they sought a continuance in the custody matter.
The trial court properly declared the adoption to be null and without effect.

CUSTODY
Having resolved the previous issues in favor of Mr. Durr, the matter of custody is rather simple. The dispute for custody in this matter is between a parent and non-parents. In such a dispute the parent has the paramount right to custody unless the parent is unfit, incapable of providing a home, or has forfeited his or her parental rights. Wood v. Beard, 290 So.2d 675 (La. 1974) and Long v. Harris, 420 So.2d 1299 (La.App. 3rd Cir.1982).
There is evidence that Mr. Durr has a prior criminal history. In fact, he served the last three months of 1976 in jail for theft. The trial judge noted in his reasons for judgment that since that time Mr. Durr has stayed out of trouble and has been a good citizen. There was testimony that his new wife significantly influenced his good behavior. There is not sufficient evidence in the record to convince us that Mr. Durr should be found unfit.
Mr. Durr also established that he can provide a home for the children either at his mother's home, where he and Doris were living at time of trial, or at a house trailer he still owns.
The facts of this case make it abundantly clear that Mr. Durr has not forfeited his parental rights. He acted as a father to the children for as long as he lived with their mother. Since that time he has made provisions for them through his Social Security benefits and has attempted to gain custody since 1978.
Under these circumstances the trial court was correct in awarding custody to Mr. Durr.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendants-appellants.
AFFIRMED.
DOMENGEAUX, J., dissents and assigns written reasons.
DOMENGEAUX, Judge, dissenting.
The questions in this case involve the procedural requirements for an adoption proceeding, the standard for establishing paternity, and the applicable guidelines governing custody of children whose legitimacy is at issue. The majority of this panel agrees with the trial court's determination that the previously rendered adoption decree violates the due process clause as it applies to the alleged father of the children, Raymond Durr. The majority affirms the decision of the trial court based upon its findings that Raymond Durr, appellee, is the biological father of the three minor children; that the prior act of adoption by James and Hazel Blue, appellants, is null and void; and that Raymond Durr is entitled to custody of the children. The adoption proceedings conducted were lacking in some respects; however, I cannot agree with the ultimate disposition of the case concerning the adoption proceedings, or with the trial court's judgment regarding paternity and custody of the children. I respectfully file this dissent to the majority's opinion.
As a preliminary statement, I find that there were some irregularities to the adoption proceedings conducted. Petitioner cites La.R.S. 9:422.4 which sets forth the requirements of voluntary surrender for private adoption:
"The father and mother indicated on the certified copy of the child's birth certificate provided in R.S. 9:422.2 must join in signing the authentic act of surrender of that child. If the father of the child is not indicated, the mother may sign the authentic act of surrender alone. *322 Should the indicated parent or parents be under the age of eighteen at the time of signing of the act of surrender, the parents of the indicated parent or parents must also sign the act of surrender; if said parents are legally separated or divorced or one is deceased, in that case the parent with custody or the living parent must sign the act; if the surrendering parent or parents are under a guardianship, said guardian should sign the act."
In this case, Raymond Durr, the father indicated on the certified copy of the children's birth certificate, did not join in signing the authentic act of surrender. The petitioner also points out that the trial court ordered a final decree of adoption on behalf of Mr. and Mrs. Blue without ordering the prerequisite interlocutory decree in accordance with La.R.S. 9:429. Petitioner contends that these violations render the entire adoption a nullity.
The Second Circuit, in In re CDT, 415 So.2d 315 (La.App. 2nd Cir.1982), held that failure to comply with the required procedures effectively invalidates an adoption. The Court in CDT, supra, concluded that when a notarial act executed is so deficient it cannot serve as an authentic act of voluntary surrender. The court then listed several primary factors which were significant in reaching its decision. The notarial act contravened the express requirements of La.R.S. 9:422.6; the natural mother did not identify herself properly, nor did she state her marital status truthfully. It should be noted, though, that the case involved the attempted adoption of a newborn child who was the legal issue of a married couple. At the time of the child's birth, the husband and wife had been physically separated for some time, although no legal separation or divorce had been finalized. It was conceded by all parties that the child was born after the husband and wife separated and that the husband was not the natural father. The husband executed an authentic act of surrender pursuant to La.R.S. 9:422.3, et seq., and consented to the adoption. The husband was considered the necessary party; the natural father was not granted any parental rights whatsoever.
However, it should be noted that such technical irregularities often are considered to constitute harmless error and do not per se render adoption decrees nullities. See In re Bourque, 245 So.2d 525 (La.App. 3rd Cir.1971). This court, in In re Simon, 406 So.2d 266 (La.App. 3rd Cir.1981), held that an interlocutory decree of adoption was properly granted by the trial court in favor of a maternal uncle, notwithstanding the deficiencies contained in the formal act of voluntary surrender. The court declared that the legislature, based upon policy considerations, did not intend to prohibit private adoptions, and further, that allowing the adoption was in the child's best interest.
It is also essential to mention that such technical irregularities do not necessarily result in the subsequent denial of the application for adoption decree. In a closely related case, the First Circuit held that the consent of the natural father of an informally acknowledged illegitimate was not required for surrender and adoption. In In re Martin, 357 So.2d 893 (La.App. 1st Cir. 1978), the Court reviewed the findings of the trial court which stated:
"Finding that the father's name was listed on the birth certificate, evidently without objection on his part, that the natural parents were living together at the time of the child's birth, that Mr. LeBouef had admitted the child to be his, the lower court held that the father's consent was required and dismissed the petition for an interlocutory decree."
Martin, supra, at 894.
The Court then examined the applicable law and concluded that the natural father's consent was not required and therefore did not constitute an impediment to the adoption proceeding. The Court reversed the trial court and explained its reasoning as follows:
"Although the natural father's name was given on the birth certificate, there is no contention that he signed it. The lower court alludes to the fact that he did *323 not contest his name being entered. However, we believe this to be insufficient; the code speaks in terms of the acknowledgment being made in the `registering of the birth'. It is difficult to equate the entering of the name plus the failure to protest under circumstances not made clear with an acknowledgment. See Allen v. Anderson, 55 So.2d 596 (Orl., La.App.1951)."
Martin, supra, at 894.
The fact that others placed the name of the father in the birth records of the child is not sufficient to constitute an acknowledgment under La.C.C. Art. 203. In re Wildeboer, 406 So.2d 687 (La.App. 2nd Cir. 1981).
Furthermore, this Court has decided in Boudreaux v. Matt, 370 So.2d 139 (La.App. 3rd Cir.1979), that strong legal consequences flow from the presumption of legitimacy established by La.C.C. Art. 184. Any evidence provided by the mother which would effectively deprive her child of its legitimate status has been deemed inadmissible to challenge the legal presumption.
This Court elaborated upon the legal implications of La.C.C. Art. 184:
"It is well settled in Louisiana that a mother's testimony or admission which would have the effect of making her child illegitimate cannot overcome the legal presumption provided by LSA-C.C. Art. 184 that the husband of the mother is the father of the children conceived during the marriage, and such testimony and admissions must be disregarded. Feazel v. Feazel, 222 La. 113, 62 So.2d 119 (La.1952); Trahan v. Trahan, 142 So.2d 571 (La.App. 3 Cir.1962); and Hodges v. Hodges, 348 So.2d 1284 (La. App. 4 Cir.1977).
The only admissible evidence which indicated the plaintiff may have been the father of Melvin Daniel was his own testimony. He said that he and the defendant had intimate relations during the time that Melvin was conceived, that he took the defendant to the hospital for the birth and that she and her legal husband, Oscar Lee Daniel, separated shortly thereafter. However, plaintiff acknowledged that defendant and Mr. Daniel lived together in an apartment all during the year before the birth occurred.
In his reasons for judgment the trial judge said: `1) I find that Melvin Daniel was conceived and born during the existence of the marriage of the defendant, Rosie Lee (Edwards) Matt to Oscar Lee Daniel. There being no evidence to show that the child was ever disavowed by Oscar Lee Daniel, the husband of the wife is, under our law, presumed to be the father of the child, and consequently, plaintiff in rule has no right to claim any of the rights given by law regarding parent and child. While it is conceivable that plaintiff in rule could be the biological father, it is equally conceivable that he is not the biological father, and I find that Mr. Boudreaux has not proved himself to be the biological father of Melvin Jay Daniel.'
Thus, the district judge not only found that the proof presented by the plaintiff was insufficient to overcome the strong presumption provided by Article 184 of our civil code, that the husband of the mother is the father of all children conceived during the marriage, but also that the plaintiff failed to establish it was more probable than not that he was responsible for the child's conception, the burden of proof ordinarily required to establish an issue of fact. We agree with his findings of fact and conclusions.
The record does not reflect that Oscar Lee Daniel has taken any steps toward disavowal of the paternity of Melvin Daniel. Since the evidence in this case has failed to establish that the child is actually the illegitimate son of Leonce Boudreaux, we do not believe that he has been subjected to any discrimination by reason of his birth or LSA-C.C. Art. 184. Consequently, it is unnecessary for us to consider the constitutional issue raised by the plaintiff in this connection. Corpus *324 Christi Parish Credit Union v. Martin, 358 So.2d 295 (La.1978)."
Boudreaux, supra, at 140-141.
Therefore, the information on the birth certificates of each child provided by the natural mother making them in effect illegitimates, cannot be considered for the purpose of proving paternity, or for establishing a claim for any of the rights given by law regarding parent and child.
In the instant case, it is my opinion that the trial court applied the wrong standard for establishing paternity of the three children. The rationale in Martin, supra, is based upon the degree of difficulty present in paternal identification. In Fontenot v. Thierry, 422 So.2d 586 (La.App. 3rd Cir. 1982), writ denied, 427 So.2d 868 (La.1983), this Court recognized the problems inherent in paternity and filiation proceedings and the resultant abuses created by the multiple paternity jurisprudence. See Spaht and Shaw, Strongest Presumption Challenged: Speculations on Warren v. Richard and Succession of Mitchell, 37 La. L.Rev. 59 (1976).
In the instant case, as in Fontenot v. Thierry, supra, there existed at the time of filing suit no legal bar precluding a person from attempting to prove the biological parent-child link. Nevertheless, the burden of proof is stringent and difficult to overcome. In a thorough review of the record, I find that Mr. Durr's paternity cannot be proven with any degree of legal certainty. The record is devoid of sufficient evidence that Mr. Durr is the natural father. See IMC Exploration Company and the Petroleum Corporation of Delaware v. Foster Henderson, 419 So.2d 490 (La.App. 2nd Cir.1982), writ denied, 423 So.2d 1149, 1150 (La.1982), reconsideration denied, 427 So.2d 866 (La.1983), which outlines the sufficient basis to determine the paternity claim by a preponderance of the evidence.
"`Preponderance of the evidence' clearly means `evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not.' Braud v. Kinchen, 310 So.2d 657 (La. App. 1st Cir.1975). Here proof that something is possible is of little probative value as to an ultimate issue of fact unless it is established with reasonable certainty that all other alternatives are impossible. Lutheran Church of the Good Shepherd of Baton Rouge v. Canfield, 233 So.2d 331 (La.App. 1st Cir. 1970)." (Emphasis theirs).
IMC Exploration Company v. Henderson, supra, at 495.
The majority has determined that Mr. Durr made a substantial proof of paternity by a preponderance of the evidence, i.e., any facts which reasonably indicate that he is the father of the girls; it derives this standard from the one stated in La.C.C. Art. 187, the action en desaveu:
"The husband can disavow paternity of a child if he proves by a preponderance of the evidence any facts which reasonably indicate that he is not the father."
However, I have interpreted the preponderance of the evidence standard in disavowing actions in Ogea v. Ogea, 378 So.2d 984 (La.App. 3rd Cir.1979), writ denied, 379 So.2d 1104 (La.1980), and arrived at a different conclusion:
"This indicates to us that the intent of the Legislature is such that a mere preponderance of the evidence by the husband would not be sufficient to disavow a child, but that his preponderance must be in connection with the type of facts illustrated in the Official Revision Comments or type of facts of the same general nature or calibre. Any other conclusion would defeat the Legislative will and would make it possible for a husband or wife or both to cause a child to be disavowed at their whim and fancy. Although, under the new Act, the presumption of paternity may not be conclusive, it nevertheless remains strong and viable."
Ogea, supra, at 989-990.
I believe that Mr. Durr has not proven adequately his paternity of the three children. *325 If the majority recognizes such a cause of action to avow paternity, then I think that the standard of proof should remain the same as the one for disavowal, particularly when the attempt to establish paternity must overcome the strongest presumption in our Code, i.e., that the husband of the mother is presumed to be the father of all children born or conceived during the marriage. La.C.C. Art. 184. According to my reasons, therefore, Mr. Durr's approval of the adoption would be unnecessary since he has not definitively established his paternity.
It should be emphasized that all three children already enjoy legitimate filiation. Their mother, Donna Sue Ammons Anders, married in 1971, and although she lived with her husband for only a short period of time before cohabitating with Raymond Durr, no action for judicial separation or divorce has ever been filed by Mr. Anders. In fact, Mr. Anders executed a notarial act recognizing all three children as legal issue of his marriage with their mother. Although Mr. Anders did admit in the act of surrender that he was not the natural father of the girls, his acknowledgment of their legitimacy and the presumption established by La.C.C. Art. 184 seems to me to preclude an alleged biological father from claiming a contradictory filiation or paternity. Rather than a disavowal action, Mr. Anders actually affirmed the girls' legitimate status as provided by La.C.C. Art. 184. La.C.C. Art. 209, even before its amendment in 1981, would have barred an action by Mr. Durr to establish paternity. The language of the Article provides that the proceeding must be instituted by the child attempting to prove filiation, or on the child's behalf, or by the child's heirs. It is apparent that the class is restricted. Mr. Durr cannot avail himself of the methods of acknowledgment set forth in La.C.C. Art. 203 because that Code provision applies only to illegitimate children. Under La.C.C. Art. 186 Mr. Durr's only course of action consisted of rebutting the presumption created by La.C.C. Art. 184. This he did not do. The majority has, in effect, judicially enacted an action for avowal, granting alleged unwed fathers a claim to establish paternity. I do not believe that this is the intent of the Legislature nor is it a logical interpretation of Louisiana or Federal jurisprudence.
For example, a new ruling by the U.S. Supreme Court, Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1984), held that a father who never established a custodial, personal, or financial relationship with his child did not have an absolute right to notice and a hearing before the child, born out of wedlock, could be adopted. The Court ruled that the mere existence of a biological link does not merit special protection of a neglected relationship. Essentially, the decision ended the exaggerated concern for the unwed father, and narrowed the application of the Court's landmark decision in Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). The Court denied both due process and equal protection claims because of the putative father's failure to establish a responsible parental relationship with the child.
These corresponding constitutional issues were originally raised in Warren v. Richard, 296 So.2d 813 (La.1974). There, the Louisiana Supreme Court, adhering to the constitutional principles announced by the United States Supreme Court in Gomez v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973), and cases cited therein, accorded dual paternity rights to a child for the wrongful death of her biological father. The Court explained the underlying rationale of these decisions:
"[I]t is the biological relationship and dependency which is determinative of the child's rights in these cases and not the classification into which the child is placed by the statutory law of the State."
Warren v. Richard, supra, at 817.
However, the Court clearly limited its opinion to upholding the validity of the child's claim under La.C.C. Art. 2315. The primary focus in these cases concerns expanding the rights of such children and prohibiting a State from invidiously discriminating *326 against them, i.e., denying them substantial benefits according to their status. See Malek v. Yekani-Fard, 422 So.2d 1151 (La.1982).
In Succession of Mitchell, 323 So.2d 451 (La.1975), the Louisiana Supreme Court held that children presumed to be the legitimate children of the husband of the mother (under La.C.C. Art. 184) could be legitimated (under La.C.C. Art. 198) by the subsequent marriage of the mother to their biological father. Again, this holding demonstrates that the Courts frequently establish a father-child bond in order to protect children from the stigma of illegitimacy.
Recent Louisiana Circuit cases have allowed the establishment of paternity despite the mother's marital status. Succession of Levy, 428 So.2d 904 (La.App. 1st Cir.1983); Fontenot v. Thierry, 422 So.2d 586 (La.App. 3rd Cir.1982), writ denied, 427 So.2d 868 (La.1983); IMC Exploration Company v. Henderson, 419 So.2d 490 (La. App. 2nd Cir.1982), writ denied, 423 So.2d 1149, 1150 (La.1982).
I respectfully suggest that these cases erroneously follow Warren v. Richard, supra, and its progeny for the proposition that in proving filiation, the mother's marital status is irrelevant. It is my position that under La.C.C. Art. 209, the law would not allow the establishment of the children's paternity. See State of Louisiana (DHHR, In re: Phillip Johnson) v. Jefferson, 448 So.2d 907 (La.App. 3rd Cir.1984), my concurring opinion.
Supporting this position, recently, in a thorough and well-reasoned opinion, the First Circuit discussed the jurisprudential trend allowing an individual to establish his or her true parentage. In Griffin v. Succession of Branch, 452 So.2d 344 (La.App. 1st Cir.1984), En Banc (Docket No. 83CA0446), the Court reviewed the legislative changes regarding La.C.C. Art. 209. The Court then reconsidered its decision in the Succession of Levy, supra, and concluded that it had rendered too broad a statutory reading of La.C.C. Art. 209; accordingly, the Court overruled its previous holding in Levy because of direct conflict with legislative intent. The Court found that the 1981 enactment of Act 720 signifies that a child entitled to legitimate filiation may not institute a proceeding to establish filiation to another man. The Griffin court stated:
"To now permit and encourage legitimate children to bastardize themselves... would contradict public policy and the `good order' envisioned in the Civil Code." (Emphasis theirs.)
Assuming arguendo that the trial judge's findings are not manifestly erroneous, and Mr. Durr is presumed to be the natural father of the girls, failure to give notice of the adoption proceeding to Mr. Durr is not a denial of due process. The Supreme Court's decision in Lehr v. Robertson, supra, substantiates this finding. The majority distinguishes the Lehr decision from the case sub judice based upon the particular facts of each. I too notice several distinguishing facts in the Lehr case, especially the situation that both the mother and presumed natural father were not married at the time the child was born, and that the mother subsequently married the party seeking to adopt the child. The Supreme Court noted that the natural mother never conceded that the claimant was the child's biological father, but for the purpose of the analysis the Court assumed that he was the natural father. Otherwise, the circumstances parallel the ones in the case before us, and I find that the Lehr case is fully applicable with regard to the due process and equal protection issues.
The Lehr Court determined that the natural father never had any significant custodial, personal, or financial relationship with the child and did not seek to establish a legal tie until several years after her birth. In discussing the due process protection afforded to the natural parent who has only an inchoate relationship with the child, the Court relied upon its previous decision in Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1979).
"`Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child *327 had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, were in the best interests of the child.' 434 U.S., at 255, 98 S.Ct., at 555."
The Court denied the putative father relief in Quilloin. The Court in Lehr held that the putative father's inchoate interests were adequately protected and that no violation of the putative father's constitutional rights had occurred. The Lehr Court continued in its analysis of the parent-child relationship. It noted that the existence or non-existence of a substantial relationship between parent and child is a relevant criterion in evaluating both the rights of the parent and the best interests of the child. In this case, I find that Mr. Durr has never developed an actual relationship with the children, nor has he shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the children.
In my review of the record, I find that Raymond Durr maintained only a sporadic relationship with the mother of the children. The mother testified that she had sexual intercourse with other men during this period. Further testimony adduced at trial revealed that Mr. Durr did not substantially contribute to the children's support until after his release from prison and when he became entitled to receive social security benefits due to a disability incurred: the payments totalled $198.00 a month for all three children.[1] Bear in mind that the children's ages at that time were 1, 2½, and 5, and that Mr. Durr made no attempt to contribute to their support or establish a parental relationship with them. Mrs. Anders' father also testified that he had helped to support the children. By the time Mr. Durr named the children as beneficiaries, their mother had already placed them with her great aunt and uncle, Mr. and Mrs. Blue. Mr. and Mrs. Blue obtained custody of the children in early 1977. Subsequently, Mrs. Anders was sentenced to serve a prison term in Texas; Mr. Durr did not attempt to obtain custody of the children until December 27, 1978. The children's ages were then 2, 3½, and 6. During the custody proceedings Mr. and Mrs. Durr were allowed to have temporary visitation rights with the children. Upon their return to the Blues, Mrs. Blue testified that the children had been unsupervised, not adequately cared for, and were suffering from head lice infestation. Throughout this period, Mr. and Mrs. Blue cared for all three girls physically, financially, and emotionally. They provided for the children and educated them. It is my opinion that Mr. and Mrs. Blue are entitled to adopt the three girls. The mere existence of a biological link does not merit full constitutional protection on behalf of Mr. Durr. Lehr v. Robertson, 463 U.S. at ___, ___, 103 S.Ct. at 2993, 2996, 77 L.Ed.2d at 626, 629; Quilloin v. Walcott, 434 U.S. at 256, 98 S.Ct. at 555, 54 L.Ed.2d at 520. See Collins v. Division of Foster Care, Jefferson Parish, Family Division, 377 So.2d 1266 (La.App. 4th Cir.1979).
As to the custody issue and eventual adoption, the best interests of the child prevails. Adoption of Latiolais, 384 So.2d 377 (La.1980); In re Simon, 406 So.2d 266 (La.App. 3rd Cir.1981). These three children have been raised by the Blues in an environment of love and affection. Their welfare would be adversely affected if the family life is disrupted by a change of custody. In re Bourque, 245 So.2d 525 (La.App. 3rd Cir.1971). I find that the trial judge's award of custody to the Durrs is clearly wrong.
I would propose to reverse the decision of the trial court as to the finding of paternity. I would also reverse the decision of *328 the trial court as to the award of custody issue, particularly because these three children have been in the Blues' continuous custody for approximately 8 years. I would remand the case to correct the deficiencies associated with the 1980 adoption decree, since it is evident that the best interests of the children would be served by allowing them to remain with the Blues as their adoptive legal parents.
For these reasons, I respectfully dissent.
NOTES
[1] Mr. Durr's first attempt to do something for the children was after he became totally disabled from an altercation in which he was cue-stick whipped resulting in some brain damage. The social security benefits for the children cost him nothing.