KLIEBERT, Judge.
Timothy Pitre (Pitre), the alleged biological father of J.S., a presumed legitimate minor child, appeals devolutively the judgment of the juvenile court ordering an interlocutory decree of adoption of J.S. by B.N. For the reasons which follow we affirm.
PRIOR TO COMMENCEMENT OF ADOPTION PROCEEDINGS
Stefani Sloan and Jack DiBartolo were married on February 4, 1984, legally separated in late 1985, and divorced August 26, 1986. J.S. was born of Stefani Sloan on November 16, 1986, some 81 days after the dissolution of her marriage to DiBartolo. Thus, under the legal presumption established by Civil Code Articles 184 and 185, at birth, J.S. was the presumed legitimate child of Stefani Sloan (the mother) and Jack DiBartolo, her husband (the presumed legitimate father). Under the Louisiana birth registration provisions [LSA-R.S. 40:34(B)(l)(a)(iii) ][1] the child should have been registered as the legitimate child of Jack DiBartolo and Stefani Sloan, and with the surname Sloan or DiBartolo. Initially, the child was registered under the mother’s maiden name, Sloan, with the space for the father’s name left blank. Subsequently, based on Acts of Acknowledgment,[2] stating Pitre was the natural father of the child, executed by the mother and Pitre, on April 29, 1987 the child’s birth certificate was altered to show the child’s surname as Pi-tre and the child’s father as Timothy Pitre.
Sometime in March or early April 1987 the mother severed her off-and-on, live-in relationship with Pitre. The relationship had commenced before the child’s conception at Sloan’s mother’s home, then Pitre’s mother’s home, and then into a rented apartment. After the separation the mother took the child to Mississippi where she executed a notarial act stating she did not know the whereabouts of the father of the child and surrendered the child for private adoption. B.N., a single female resident of Mississippi and the prospective adoptive parent, took physical possession of the child and on April 10, 1987, the Chancery Court of Harrison County granted an inter *1199 locutory judgment of adoption which gave custody of the child to B.N., pending an investigation. With the exception of an approximate two month period where the Mississippi court granted temporary custody to a guardian ad litem, B.N., the prospective adoptive parent, has had physical possession and custody of the child under a Mississippi court order since April 1987.
While the Mississippi actions were ongoing, Pitre filed an action for custody of the child in the Twenty-fourth Judicial District Court, Parish of Jefferson. By ex-parte order dated June 24, 1987, the Jefferson court granted him custody of the child. Then, based on the acknowledgments and the ex-parte custody order, on Pitre’s petition, the Mississippi court recognized Pitre as the natural father and on July 24, 1987 granted him custody of the child. Thereafter on the mother’s application for writs, on August 21, 1987 this court granted a stay of the ex-parte custody order granted by the Jefferson court.[3] Additionally, we remanded the case to the trial court for a hearing of a petition to annul the ex-parte custody order.[4] Ultimately, the Mississippi court deferred to the Louisiana courts and stayed its adoption and custody proceedings awaiting the decisions of the Louisiana courts.
COMMENCEMENT OF THE LOUISIANA ADOPTION
On October 14, 1987, B.N., the prospective adoptive parent here and in the Mississippi action, filed in the Juvenile court, Parish of Jefferson, a petition for adoption of the child. To comply with LSA-R.S. 9:422.3(A),[5] attached to the petition were notarial Acts of Surrender signed by the mother on September 21, 1987 and by the presumed legitimate father on October 8, 1987. The acts consented to the adoption and surrendered custody of the child to B.N.’s attorney. In the Act of Surrender signed by the presumed legitimate father, he denied paternity. However, at no time has he filed an action in disavowal as required by Louisiana Civil Code Articles 187 and 189 to rebut the presumption of paternity.
In the Louisiana adoption proceedings, Pitre filed a motion to terminate the adoption on the grounds, among others, that his consent and surrender was necessary under the Louisiana statutory scheme to effectuate a private adoption. The juvenile judge denied the motion and allowed the proceedings to continue. We denied Pitre’s writ application on the ruling because Pitre had an adequate remedy by appeal. See Docket No. 87-C-811. The supreme court also denied writs. See Docket No. 87-CK-0657.
Pitre then filed an intervention opposing the adoption. In response counsel for the prospective adoptive parent filed a motion to limit the scope of the intervention. Based on the confidentiality of adoption proceedings mandated by LSA-R.S. 9:429 and 9:432 the trial court imposed limitations[6] on Pitre’s intervention but let the adoption hearings proceed. On termination of the hearings, the trial court granted the Interlocutory Decree of Adoption and Pitre filed this appeal.
On appeal Pitre urges two primary arguments. The first is grounded in the contended invalidity of the Acts of Surrender executed by the mother. The following reasons are urged for their invalidity: (1) at the time the Louisiana Act of Surrender was executed (September 21, 1987) the *1200 mother did not have custody because the earlier June 24, 1987 ex parte order of the Jefferson Court had granted him custody, and (2) the Mississippi Act of Surrender (April 7, 1987) was executed in violation of the Interstate Compact on the Placement of Children. Hence, he contends the private adoption proceedings are invalid due to the absence of valid Acts of Surrender executed by the mother. His second argument is grounded in the contention LSA-R.S. 9:422.3(A) must be interpreted as requiring the consent of the natural father to the adoption, for any other interpretation would render the adoption statute unconstitutional.
The prospective adoptive parent answered the appeal seeking a reversal of certain factual findings of the juvenile judge. Additionally, in response to Pitre’s arguments urged on the appeal, she contends (1) the mere appearance of Pitre’s name on the birth certificate does not grant him any substantive rights because the child’s birth certificate was unlawfully altered and in violation of Louisiana Public Policy against bastardizing the child; (2) the mother’s Louisiana Act of Surrender was valid and effective because (a) the ex-parte custody order granted by the Twenty-fourth Judicial District Court to Pitre was never effective because stayed by this court, (b) the technical violations of the Interstate Compact on the Placement of Children does not nullify the adoption because retroactive approval and consent to the adoption was given by the mother and the presumed legitimate father, thus, the statutory requirements for a private adoption were met, and (3) the best interest of the child is served by granting the adoption.
Counsel for the prospective adoptive parent did not in the trial court nor here contest Pitre’s contention the exact procedures of the Interstate Compact (adopted by Louisiana and Mississippi)[7] were not complied with prior to the placement of the child in Mississippi. Rather, he urges upholding the placement notwithstanding any initial violations of the Compact.
The primary purpose of the Compact is to monitor the placement of any child who is sent from one state to another for placement in order to safeguard the “best interest” of the child. The Compact contains requirements which must be complied with in order to effectuate a legal placement. These requirements indicate written notice to and approval by the appropriate legal authorities in the receiving state of the intended placement are necessary. Pitre shows the mother, the prospective adoptive parent, and her Mississippi attorney failed to notify and obtain the approval of the Mississippi Department of Public Welfare prior to execution of the Mississippi Act of Surrender dated April 7, 1987. Therefore, they contend since the placement was invalid, the adoption proceedings should be terminated.
The Juvenile Judge held the Interstate Compact did not mandate a termination of the placement because of the violations. Further, since there was a subsequent approval of the placement by the appropriate authorities and the “best interest” of the child was served by the placement, she rejected Pitre’s contentions and refused to terminate the adoption proceedings. We cannot say she erred in doing so.
As to Pitre’s claims the Louisiana Acts of Surrender attached to the petition for adoption were invalid, we note the award of custody of J.S. to Pitre was by an ex-parte order issued after the Mississippi placement and on a petition against the mother and the attorney for the prospective adoptive parent with service only on the mother.[8] Further, on August 21, 1987 this court issued a stay of the ex-parte custody order to Pitre and remanded for an evidentiary hearing on a petition to annul the ex-parte custody order. The results of that hearing, if concluded, are not of record here. However, since the record does not support Pitre’s contention he had legal cus *1201 tody when the mother and the presumed legitimate father executed the Louisiana Acts of Surrender (September and October 1987) his argument is without merit.
Ergo, squarely posed for decision here is the question: Do the Louisiana Adoption Statutes require the consent of Pitre for the adoption and if not, does that render the statutes unconstitutional?
The statutory scheme[9] which permits the surrender of children for private adoption does not specifically provide for the situation involved here. Pitre argues, however, that since LSA-R.S. 9:422.4(A)[10] requires both natural parents to execute the Act of Surrender where both parents’ names are reflected on the official birth certificate, his consent is needed for the adoption here to take place because his name is reflected as the father on the birth certificate. We do not agree, for under the birth registration provisions (see footnote 1) the mother’s husband was required to be listed on the birth certificate as the father of the child and his surname given to the child or his consent given to use the mother’s maiden name. The fact Pitre’s name appears as the father of the child on the unlawfully altered birth certificate does not overcome the legal presumption of Civil Code Article 185 that the husband of the mother is the legitimate father of the child and therefore the father whose consent to the adoption must be given.
There is a legitimate state interest in the disparity of treatment afforded to Pitre and the child’s legal parents. The state’s interest is the desire to maintain family unity and prevent the bastardization of a legitimate child. Only DiBartolo could have contested the paternity of J.S. and his time for doing so has long since expired. Although recent federally constructed constitutional rights of parents and children have prompted state courts to allow legally presumed legitimate children or their alleged biological father to prove paternity of someone other than the presumed legitimate father for purpose of visitation, support, and inheritance rights, it was done under the legal concept that the child’s “best interest” required it and it did not bastardize the child.[11] Thus, in our view, Pitre’s rights as the biological father; even if proven, would not equate to those of a legitimate father. Nor does the failure to grant him the same statutory rights as those of the legitimate parents’ veto power over the adoption infringe on his constitutionally guaranteed rights of “due process” and “equal protection”.
In Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) which involved a step parent’s adoption of a mother’s illegitimate child, the mother tried to prevent the biological father from having any relationship with the child and consented to her husband’s adoption of the child. In a split decision, the U.S. Supreme Court *1202 upheld the adoption emphasizing that the statute had authorized a simple means of protecting the biological father’s rights which the father had chosen to ignore. In the course of reaching that conclusion the organ of the court 103 S.Ct., at page 2993 said:
"... When an unwed father demonstrates a full commitment to the responsibilities of parenthood by “com[ing] forward to participate in the rearing of his child,” Caban [v. Mohammed] 441 U.S. [380] at 392, 99 S.Ct. [1760] at 1768 [60 L.Ed.2d 297 (1979)] his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he “act[s] as a father toward his children.” Id., at 389, n. 7, 99 S.Ct., at 1766, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection.”
Thus, it is not from the biological link that an unwed father’s constitutional rights emanate but rather, from the unwed father’s commitment to the responsibilities of parenthood. Pitre contends he established such a relationship therefore Durr v. Blue, 454 So.2d 315 (La.App. 3rd Cir.1984) controls here. In Durr, the mother and biological father were living together and caring for two children. Shortly after the birth of a third child they separated. Although the mother was legally married at the time of the conception, the biological father’s name was shown on the birth certificate. When the biological father sought custody, the mother surrendered the children to foster parents who instituted adoption proceedings. The Third Circuit vacated the adoption as a violation of the biological father’s right of due process (he did not have notice of the adoption) and gave custody to the biological father.
Durr, supra, is distinguishable on its facts from the case involved here. In the instant case, the juvenile court looked to the circumstances surrounding Pitre and his relationship with J.S. Finding thfft Pi-tre had acknowledged the child and “accepted some manner of responsibility for the child’s future” the juvenile court granted him the opportunity to be heard and to present evidence as to the child’s best interest. Therefore, Pitre’s due process rights to notice and an opportunity to be heard were granted.
Pitre additionally contends his “equal protection” rights were violated because he did not have the same rights as the mother to veto the adoption. As previously shown, he did not have the same parental rights of consent as the mother because those rights were granted to the presumptive legal father and there was a legitimate state interest and purpose in doing so. However, he had the same rights to oppose the adoption as the mother had after her execution of the Act of Surrender. She chose not to make an appearance while he chose to oppose and failed because the trial court found it to be in the “best interest” of the child to allow the adoption. We cannot say he was deprived of equal protection or that the juvenile judge erred.
The adoptive parent had the burden of proving the adoption was in the child’s best interest. In re J.M.P., 528 So.2d 1002 (La.1988) at page 1013, the court said: “... in resolving a private custody dispute between the natural parent and the proposed adoptive parents, the most important factors are: (1) Whether each person seeking custody is fit to be the child’s parent; (2) Whether either of the adoptive parents has a psychological relationship with the child; and (3) The natural parent’s biological relationship with the child.”
Further, in analyzing the parents’ fitness, the supreme court also stated at page 1013: “[t]he correct resolution of the dispute [between a prospective adoptive parent and a natural parent] is obvious where one claimant poses an immediate and substantial threat to the child’s physical health and the other does not.” The juvenile judge found and we agree such a threat exists here.
At the best interest hearing, evidence was presented and the trial court found that B.N. was a 33 year old female adopting as a single parent. She has a stable background and a very close, supportive family who lives nearby. The family mem *1203 bers visit each other frequently, and accept and love J.S. as part of their family. B.N. has a steady employment history. She has worked as a paramedic for eight years and has been in her present employment since January 8, 1983. Her employer provides B.N. and the child with full medical insurance coverage.
The Mississippi Department of Public Welfare investigated B.N. and reported she was capable of providing a safe, happy, and healthy environment in which to raise a child. Moreover, a strong relationship had evolved between the child and the prospective adoptive parent. In contrast, the evidence shows Pitre has an unstable employment history and a serious substance abuse problem which fosters violent tendencies. Pitre has physically and verbally abused Stefani; including breaking in a door at her mother’s residence, searching for Stefani, then verbally attacking her. Furthermore, during one drunken episode he stabbed a friend with a knife while “playing around.” The friend died.
The juvenile court found, and the record supports her conclusion there were problems with Pitre’s visitation of J.S. in Mississippi. Since April 1987 the child has lived in Mississippi either with B.N. or Laurie Caldwell, a guardian ad litem appointed by the Mississippi Court, not only to investigate B.N. but at one point to have actual physical custody of J.S. During this time, Pitre was granted supervised visitation rights with J.S. by the Mississippi Court. Because of concern for the child’s safety an investigation of Pitre’s background was made. The investigation revealed an arrest register (in evidence) showing Pitre has 15 felony arrests and 10 misdemeanor arrests, along with other evidence of substance abuse and violence. The officials considered a comment by Pitre, that he ought to take the child and run, as a threat, and consequently required the supervised visitations to take place in a secure area.
Although most visits were uneventful, two were cause for concern. During one visit, Pitre left J.S., went to his car, then to the bathroom where he stayed 5-10 minutes before returning. There was testimo-. ny that upon his return his demeanor was indicative of one using a controlled dangerous substance. During one other visit in which Mrs. Caldwell observed Pitre, she testified that he staggered, his speech was slurred, his eyes were dilated, and he had a stale alcohol odor on him. Pitre had also failed to appear for his last three scheduled visits.
Although there is evidence that Pitre loves J.S., has cared for him at least part of the first four months of his life and strongly desires to raise the child, the record overwhelmingly supports the juvenile court’s conclusion “Pitre would not be able to provide the child with a stable or secure home environment but, rather, one marked by alcohol abuse and financial and emotional insecurity.” To us the record supports the further conclusion that placing the child with Pitre would pose an immediate and substantial threat to the child’s safety.
Further, Dr. Cowardin, an expert in child psychiatry, testified as to her evaluations of the psychological relationship between B.N. and J.S. In her opinion J.S. is securely attached to B.N. and experiences her as a parent. Her opinion was based on the fact J.S. would cry and refuse to be separated from B.N., which is exactly the response expected from a mother-child relationship. J.S. also showed an attachment to B.N.’s sister.
Neither Dr. Cowardin nor any other expert had observed Pitre and J.S. together. Pitre and his mother, however, testified there was an excellent relationship between them and offered photographs. to support their testimony. Given the obvious inconsistencies in their testimony on other issues and all of the evidence here, we cannot say Pitre had or could establish a better psychological relationship with the child than the one the prospective adoptive parent now enjoys. Moreover, although not contested here and not relied on by us in reaching our conclusion, in the absence of blood tests and given the mother’s loose morals there is a serious question of whether Pitre is in fact the biological father of J.S.', , ,
*1204 Although the natural parent has a preference over others for custody, where, as here, the natural parent poses a danger to the child’s physical health and the child has formed a psychological attachment to the prospective adoptive parent, we cannot say the Juvenile Judge erred in concluding the “better interest” of the child was to issue the interlocutory decree of adoption.
For the reasons above stated therefore we affirm the Juvenile Court’s ruling.
AFFIRMED.

. LSA-R.S. 40:34(B)(l)(a)(iii) provides as follows:
"B. The forms shall be printed and supplied by the state registrar and the required contents are:
(1) Contents of birth certificate. The certificate of birth shall contain, as a minimum, the following items:
(a) Full name of child.
******
(iii) The surname of the child shall be the surname of the husband of the mother if he was married to the mother of the child at the time of conception and birth of the child or had not been legally divorced from the mother of the child for more than three hundred days prior to the birth of the child, or, if both the husband and the mother agree, the surname of the child may be the maiden name of the mother or a combination of the surname of the husband and the maiden name of the mother."

. The Acts of Acknowledgment complied with the requirements of Civil Code Article 203 and were dated November 17, 1986. They were not however recorded, as required by LSA-R.S. 9:422.14(A) until after the mother executed an Act of Surrender in Mississippi and gave up physical custody of the child.

. See Writ Docket No. 87-C-588, Fifth Circuit Court of Appeal.

. Although we are not privy to the results of the hearings, we note that as late as March 9, 1988 this court denied a writ application on an issue involving the taking of a deposition. See Docket No. 88-C-163. Our state supreme court also denied writs. See Docket No. 88-CK-0560.

. LSA-R.S. 9:422.3(A) provides in pertinent part as follows:
“A. The parent or parents of a child may execute an authentic act for the purpose of voluntarily surrendering the custody of the child for private adoption ...”

.The limitations originally imposed by the court were subsequently substantially relaxed by agreement of counsel. No strong arguments are urged on appeal relative to the restrictions. Further, the record indicates Pitre was given every opportunity to present his case on the "better interest" of the child hearing.

. LSA-R.S. 46:1700 et seq.; Section 43-18-1 et seq., Mississippi Code Annotated.

. There was no service on the person with the legal custody at the time, i.e., the guardian ad litem or the prospective adoptive parent.

. LSA-R.S. 9:401 et seq.

. LSA-R.S. 9:422.4(A) provides as follows:
A. If the identities of both natural parents of the child being surrendered for private adoption are stated on the child’s official birth certificate, or an application for certificate in the event the certificate has not been issued, both parents and their legal representatives, if applicable, must execute an authentic act for such act to be presumptive evidence of a legal and voluntary surrender. Both natural parents and their legal representatives, if applicable, may, but are not required to, evidence their intention to surrender the child for private adoption by executing a single act jointly. If two separate acts are executed, each act must recite the elements required by R.S. 9:422.6 in order for it to conclusively bind the executing parent or his or her legal representative, if applicable.

.In passing, we note a biological father who was held by a California Supreme Court to be statutorily precluded from establishing a parent-child relation with his daughter because her mother was married to another man at the time conception took place has taken his case to the United States Supreme Court. Michael H. v. Gerald D., U.S. Supreme Court Docket No. 87-746. The statute at issue, California Evidence Code Section 621, provides generally that the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be the child of the marriage. The only statutory exception to the presumption arises when the husband (alone) or the wife and the biological father together, petition for a blood test to establish paternity within two years of the child’s birth.